PUBLIC CITIZEN, et al.,
Plaintiffs–Appellants,

v.

NATIONAL ADVISORY COMMITTEE ON MICROBIOLOGICAL CRITERIA FOR FOODS, et al., Defendants–Appellees.

No. 88–5352.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 11, 1989.

Decided Sept. 26, 1989.

Eric R. Glitzenstein, Washington, D.C., with whom Patti A. Goldman and Alan B. Morrison, Washington, D.C., were on the brief for the appellants.

Michael E. Robinson, Attorney, Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Leonard Schaitman, and Douglas N. Letter, Attorneys, Dept. of Justice, Washington, D.C., were on the brief for appellees.

Before EDWARDS, SILBERMAN, and FRIEDMAN,* Circuit Judges.

Opinion for the court filed PER CURIAM.

Opinion, concurring in the judgment, filed by Circuit Judge FRIEDMAN.

Opinion, concurring in the judgment, filed by Circuit Judge SILBERMAN.

Opinion concurring in part and dissenting in part filed by Circuit Judge EDWARDS.

PER CURIAM:

This is an appeal from a judgment of the United States District Court for the District of Columbia dismissing a complaint filed by public interest organizations that challenge, as violating the Federal Advisory Committee Act (FACA), 5 U.S.C. App. 2, § 5(b)(2)–(3) (1982), the composition of a federal advisory committee. *Public Citizen v. National Advisory Committee on Microbiological Criteria for Foods*, 708 F.Supp. 359 (D.D.C.1988).

The members of the panel are divided about the correct disposition of the case. Judge Silberman concludes that the appellants do not have standing to maintain the suit and that their claims are not justiciable. Judge Friedman is of the view that the district court correctly rejected the challenges to the advisory committee. Judge Edwards concludes that the appel-

---

* Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a).

lants have standing and raise justiciable claims, and that the appellants have shown that the composition of the advisory committee violates the Act. The result of these divergent views of the members of the panel is that the judgment of the district court is affirmed, with Judge Edwards concurring in part and dissenting in part.

The separate opinions of the members of the panel follow.

Opinion, concurring in the judgment, filed by Circuit Judge FRIEDMAN.

I

In November 1987, the United States Department of Agriculture (Department) announced plans to establish a National Advisory Committee on Microbiological Criteria for Foods (Committee). *See* 52 Fed. Reg. 43,216 (1987). The purpose of the Committee was to provide advice and recommendations to the Secretaries of Agriculture and Health and Human Services (HHS) on the development of microbiological criteria by which the safety and wholesomeness of food could be assessed.

The Committee's mandate was primarily technical and scientific. Developing microbiological criteria for foods requires an understanding of the complex science in the area and an appropriate background and training. The types of microorganisms that can contaminate foods, the conditions under which these microorganisms grow, and the technologies available to detect, control, or eliminate such microorganisms must be evaluated.

The Committee's charter designates the Assistant Secretary of Agriculture for Marketing and Inspection Services as Chairperson of the Committee, the Commissioner of the Food and Drug Administration (FDA) to serve as the Vice Chairperson, a representative of the Food Safety and Inspection Service to serve as Executive Secretary, and an FDA representative to act as an ex officio member for liaison. The charter further provides that the Committee is to consist of "not more than 20 [additional] individuals with expertise in food service, microbiology and other relevant disciplines." Committee members are to be appointed by the Secretary of Agriculture after consultation with the Secretary of HHS.

The Operating Procedures for the Committee provide that membership on the Committee shall consist of "appropriate personnel" selected from the primary federal agencies having responsibility for assuring that foods are safe and of acceptable quality, state and/or municipal food regulatory agencies, the food industry, and academia.

The Secretary of Agriculture initially appointed 19 individuals to the Committee. One individual, an employee of a food processing company, resigned in September 1988. The Committee membership thus consisted of two university professors, one state agriculture department official, one state department of agriculture and consumer services official, two persons employed by food research firms, six persons employed by federal agencies, and six persons employed by private food companies.

Each of the Committee's original members has an extensive background in food microbiology. Fourteen of the 18 members have Ph.D.'s in food microbiology or related disciplines, one is a medical doctor, and most have written extensively in the area of food science. One member, Dr. Mitchell Cohen, Deputy Director of the Centers for Disease Control, has been involved in public health issues. Another member, Dr. Martha Rhodes, is the Assistant Commissioner of the Florida Department of Agriculture and Consumer Services, a State agency charged with the protection of consumer interests. In addition to Dr. Cohen, five other members are employees of federal agencies that are charged with ensuring food safety.

The Committee held its first meeting on April 5, 1988. By letter dated May 12, 1988, the appellants requested the Secretary of Agriculture to "take immediate action to appoint consumer representatives with public health expertise to membership" on the Committee, and, further, offered to "recommend ... individuals with appropriate credentials in public health and

consumer concerns." The Committee's letter stated:

Despite the fact that the Committee's stated function—to provide advice and recommendations regarding the "criteria by which the safety and wholesomeness of food can be assessed"—is of vital concern to the consuming public, the Committee includes absolutely no non-governmental individuals who are expert in the public health issues or who can be expected to insist that the public health concerns in avoiding contamination be balanced against industry concerns with controlling costs and processing methods....

....

To compound matters, the Committee is dominated by industry representatives who have a direct financial stake in the Committee's work. Indeed, of those members who are not federal employees ... it appears that well over 75 percent are representatives of the regulated industry.

The Assistant Secretary replied:

Although the Committee is composed of scientific experts, the consumer perspective is also brought to the Committee by its membership. In particular, Dr. Martha Rhodes, Assistant Commissioner of the Florida Department of Agriculture and Consumer Services, was selected for the Committee because of her expertise in microbiology, public health, and consumer affairs, as well as her involvement with State governmental matters. If you would like to recommend others for membership on the Committee, we will be happy to review their qualifications and consider them when there is a vacancy.

The Assistant Secretary further noted: "In accordance with the provisions of the FACA, the first meeting of the Committee and the working groups was open to the public, and provisions were made for submission of public comments. It is our intention to continue this practice."

The appellants then filed the present action in the district court seeking declaratory and injunctive relief against the government's alleged violation of the Federal Advisory Committee Act. They also sought a preliminary injunction against the Committee acting until it was "in compliance with the requirements" of the Act.

After a hearing on the preliminary injunction, which the parties agreed to treat as a trial on the merits, the district court denied the motion for a preliminary injunction and dismissed the complaint. The court held that the appellants "have failed to carry the required burden for injunctive relief," 708 F.Supp. at 362, in that they had offered no evidence "that the Committee is unfit [to perform its advisory function]," *id.* at 363, "that the Committee members selected from the food industry have acted improperly or exceeded the scope of the mandate of the Committee in the work that the Committee has performed to date," or "that [consumer] viewpoints are not adequately represented by the Committee." *Id.*

II

In a supplemental brief filed after the case was argued on May 11, 1989, the government reported that on June 15, 1989, the Secretary of Agriculture appointed six new members to the Committee. One of the new members is Dr. Frank M. Calia, Vice Chairman and Director of Education for the Department of Medicine at the University of Maryland School of Medicine. Dr. Calia was one of three individuals the appellants had recommended for appointment to the Committee. According to the appellants' letter of recommendation,

each of these individuals has extensive scientific expertise in one or more of the areas identified in the Federal Register notice, and each would bring a strong consumer and/or public health perspective to bear on the work of the Committee.

The government contends that the appointment to the Committee of Dr. Calia has made the case moot since "[w]ith the appointment of Dr. Frank M. Calia, one of Public Citizen's own candidates ..., Public Citizen can no longer claim that 'there are absolutely no representatives of consumer

organizations' on the Committee." The appellants respond that despite the appointment of Dr. Calia, "the composition of the Committee and its Working Groups continues to be in violation of the balanced representation requirements of the Federal Advisory Committee Act.... " The appellants further urge that the court should ignore the recent changes in the composition of the Committee and "should review the district court decision on the basis of the record properly before it and then—if the Court agrees with appellants that the district court did not correctly apply FACA's balanced representation requirements—remand the case to the district court for an application of the correct legal standards to the present composition of the Committee and a determination of what relief is appropriate at this time."

A. The case is not moot. The appellants' response to the government's contention of mootness shows that there still is an "actual controversy" between the parties, *Steffel v. Thompson*, 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 1216 n. 10, 39 L.Ed.2d 505 (1974), over the legality of the Committee's composition, *Walling v. Helmerich & Payne*, 323 U.S. 37, 43, 65 S.Ct. 11, 14, 89 L.Ed. 29 (1944), despite the addition of Dr. Calia to the Committee.

B. Although normally an appellate court decides an appeal on the basis of the record before the trial tribunal, *National Anti-Hunger Coalition v. Executive Comm. of the President's Private Sector Survey on Cost Control*, 711 F.2d 1071, 1075 (D.C.Cir.1983), this does not mean that the appellate court must blind itself to events occurring after that record was closed. *See Goland v. CIA*, 607 F.2d 339, 367, 370 n. 7 (D.C.Cir.1979) (per curiam on motion to vacate and petition for rehearing), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). In the present case there is no dispute over Dr. Calia's present membership on the Committee or the fact that the appellants recommended him for appointment as an appropriate "consumer representative." There is accordingly no reason for this court to remand the case to the district court to augment the record to reflect the membership

on the Committee of Dr. Calia (and the five other new members).

The appellants seek declaratory and injunctive relief against the operation of the Committee. In determining whether the appellants are entitled to such relief, it is appropriate to consider the composition of the Committee at the time of the court's judgment. Indeed, for the court to decide the appeal without regard to the changed facts that now exist, would be to render an advisory opinion, which this court has no authority to do. Accordingly, the validity of the Committee must be determined on the basis of its present membership.

As explained in part III below, even as originally constituted, the Committee did not violate the Act. *A fortiori*, a reconstituted Committee which includes one member whom the appellants themselves recommended, because he "would bring a strong consumer and/or public health perspective to bear on the work of the Committee," satisfies the statute.

### III

Section 5 of the Act, 5 U.S.C. App. 2, which the appellants assert the composition of the Committee violates, provides in pertinent part:

(b) ... Any such legislation [establishing an advisory committee] shall—

.      .      .      .      .

(2) require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee;

(3) contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment;....

(c) To the extent they are applicable, the guidelines set out in subsection (b) of this section shall be followed by the Presi-

dent, agency heads, or other Federal officials in creating an advisory committee. 5 U.S.C. App. 2 § 5 (1988). These provisions were designed to counter "the belief that these [advisory] committees do not adequately and fairly represent the public interest [or] that they may be biased toward one point of view or interest." S.REP. No. 1098, 92d Cong., 2d Sess. 4–5 (1972).

A. Although the statute does not define the term "fairly balanced" in section 5(b)(2), the Senate report on the Act states that "legislation [establishing an advisory committee] shall ... require that membership of the advisory committee shall be representative of those who have a direct interest in the purpose of such committee." S.REP. No. 1098, 92d Cong., 2d Sess. 9 (1972). Referring to this statement, this court has noted that the Act's "legislative history makes clear, [that] the 'fairly balanced' requirement was designed to ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee." *National Anti–Hunger Coalition,* 711 F.2d at 1074 n. 2. This does not mean, however, that "Congress intended the 'fairly balanced' requirement to entitle *every* interested party or group affected to representation on the Commission." *National Treasury Employees Union v. Reagan,* 1988 WL 21700 at 3 (D.D.C. Feb. 25, 1988) (Civ. A. No. 88–186).

The appellants originally contended that because the Committee's recommendations will directly affect the interests of consumers, the Act requires that the Committee contain representatives of consumers, and that the Committee lacks such representation because "not a single member of the Committee works for, or is associated with, a consumer or public health organization, despite the fact that there are such individuals who have expertise and backgrounds in the very issues to be scrutinized by the Committee."

Section 5, however, "confers no cognizable personal right to an advisory committee appointment." *National Anti–Hunger Coalition,* 711 F.2d at 1074 n. 2. Thus, none of the individuals the appellants have recommended is entitled to a position on the Committee. Moreover, the appellants have not pointed to any provision of the Act, and I know of none, that requires that the Committee must include individuals who work for, or are associated with, a consumer or public health organization.

The appropriate inquiry in determining whether the Committee's membership satisfies the "fairly balanced" standard in section 5(b)(2) is whether the Committee's members "represent a fair balance of viewpoints given the functions to be performed." 711 F.2d at 1074. Since the Committee's function in this case involves highly technical and scientific studies and recommendations, a "fair balance" of viewpoints can be achieved even though the Committee does not have any members who are consumer advocates or proponents of consumer interests.

The statutory directive that membership of the Committee be "fairly balanced" does not mean that such balance can be provided only by individuals who work for, or are associated with, a consumer or public health organization. The Act does not require that "consumer organizations" be directly represented on the Committee. Section 5(b)(2) is a general provision requiring only that the membership of an advisory committee be "fairly balanced"; it does not specify how the "fairly balanced" membership is to be achieved in terms of either the type of representatives or their number. In contrast, in other statutes governing the composition of advisory committees, Congress specified precisely which groups were to be represented. For example, section 17 of the Federal Energy Administration Act of 1974, 15 U.S.C. § 776, enacted two years after the FACA, provides, in pertinent part:

(a) Whenever the Administrator shall establish or utilize any ... committee, ... not composed entirely of full-time Government employees, ... the Administrator shall endeavor to insure that each such group is reasonably representative of the various points of view and functions of the industry and users affected, including those of residential, commer-

cial, and industrial consumers, and shall include, where appropriate, representation from both State and local governments, and from representatives of State regulatory utility commissions, selected after consultation with the respective national associations.

15 U.S.C. § 776(a) (1987).

The determination of how the "fairly balanced" membership of an advisory committee, in terms of the points of view represented and the functions the committee is to perform, is to be achieved, necessarily lies largely within the discretion of the official who appoints the committee. In my view, the membership of the Committee that the Secretary of Agriculture appointed did not violate the "fairly balanced" requirement of the Act, and the Secretary did not abuse his discretion by failing to include on the Committee direct representatives of consumer organizations.

As noted, the members of the Committee are highly trained and skilled in food microbiology. Two of the original members, Drs. Rhodes and Cohen, fairly may be viewed as representing the interests of consumers in being protected against contaminated and unwholesome food. Dr. Calia, recently appointed to the Committee, is by the appellants' own standards an appropriate "consumer representative."

Dr. Rhodes, the Assistant Commissioner of Agriculture of the Florida Department of Agriculture and Consumer Services, is a member of the American Public Health Association, has received awards for "Recognition of Outstanding Abilities and Competence in Administration and Enforcement of Food and Drug Law," has served as a member of the Steering Committee of the National Conference on Food Protection, and has made numerous presentations to "Consumer and Professional Food Related Societies." Dr. Cohen, the Deputy Director for the Division of Bacterial Diseases at the Center for Infectious Diseases, has worked for the Centers for Disease Control since 1976. He has served as a consultant for the World Health Organization, the Food and Drug Administration, and the National Institutes of Health, and has re-

ceived an Outstanding Service Medal from the Public Health Service. Dr. Cohen is deeply involved in representing and furthering public health interests.

The appellants challenge the suitability of Dr. Rhodes and Cohen to represent the interests of consumers because they are government employees. They assert that "FACA's legislative history expressly indicates that 'consumer, or other public interest groups' *outside of government* should be represented on advisory bodies, like the Microbiological Committee, that have a direct impact on the public health and safety." They cite H.R.REP. No. 1017, 92d Cong., 2d Sess. 6 (1972), *reprinted in* 1972 U.S. CODE CONG. & ADMIN.NEWS 3491, 3496, which states:

One of the great dangers in the unregulated use of advisory committees is that special interest groups may use their membership on such bodies to promote their private concerns. Testimony received at hearings before the Legal and Monetary Affairs Subcommittee pointed out the danger of allowing special interest groups to exercise undue influence upon the Government through the dominance of advisory committees which deal with matters in which they have vested interests.

In its report on "The Establishment of a National Industrial Wastes Inventory" this committee commented on the operations of the Advisory Council on Federal Reports, which was organized by several national business organizations at the request of the Office of Management and Budget. When Council members met with government officials to consider a proposed national industrial wastes inventory questionnaire, only representatives of industry were present. No representatives of conservation, environment, clean water, consumer, or other public interest groups were present. This lack of balanced representation of different points of view and the heavy representation of parties whose private interests could influence their recommendations would be prohibited by the provisions contained in section 4 of the bill.

That statement, however, referred to a situation where the only individuals who met with government officials were representatives of industry. The membership of the Committee in this case cannot properly be so described. This statement does not indicate that Congress intended to require that representatives of "consumer, or other public interest groups" be members of every advisory committee that deals with issues that affect the public interest.

The appellants criticize the appointment of Dr. Calia because "[w]ithout providing any explanation, USDA refused to appoint either of the individuals nominated by Public Citizen who has actually worked for a consumer organization." As noted, however, nothing in the Act requires that any member of the Committee must have "actually worked for a consumer organization." Having recommended Dr. Calia to the Secretary an an appropriate member of the Committee, who "would bring a strong consumer and/or public health perspective to bear on the work of the Committee," the appellants cannot now validly complain because the Secretary appointed him instead of the other two individuals the appellants also recommended.

The appellants also contend that since Dr. Calia has been assigned to one of the Committee's two working groups, the Seafood Group, the Committee's composition still violates the Act because "one of the two working groups formally established by the Committee—the Meat and Poultry Working Group—continues ... to lack any member who is even arguably a consumer representative." This argument fails because, as noted, the composition of the Committee (or its working groups) does not violate the Act merely because it does not include a sufficient number of "consumer representatives" as the appellants define that term.

B. Section 5(b)(3) requires that provision be made to assure that the advisory committee's "advice and recommendations ... not be inappropriately influenced ... by any special interest...." The requirement is designed to protect against "the danger of allowing special interest groups to exercise undue influence upon the Government through the[ir] dominance of advisory committees which deal with matters in which they have vested interests." H.R.REP. No. 1017, at 6, *reprinted in* 1972 U.S. CODE CONG. & ADMIN.NEWS at 3496. A Senate staff report submitted by Senator Percy stated:

> Viewed in its worst light, the federal advisory committee can be a convenient nesting place for special interests seeking to change and preserve a federal policy for their own ends. Such committees stacked with giants in their respective fields can overwhelm a federal decision maker, or at least make him wary of upsetting the status quo.

118 CONG.REC. 30,276 (1972).

The appellants contend that the Committee is being inappropriately influenced by a special interest group, the food industry. They assert that "[a]s currently constituted, a majority of the Committee's 18 members are employees, contractors, or consultants of the food industry—*i.e.*, six direct industry representatives, two persons who work for research companies whose clients are food companies, and two 'academic' representatives, both of whom have done substantial consulting work for the food industry, and one of whom admits that his program, the Food Research Institute, is funded by 'unrestricted gifts' from the food industry."

The appellants have not shown that the original Committee was dominated or "inappropriately influenced" by food industry representatives. Only six of the 18 members were employed by the food industry. The appellants' contention that four other members of the Committee—the two employees of independent food research firms and the two university professors—represent food industry interests is unconvincing. The mere fact that the individuals employed by independent food research firms have food company clients or that the professors have performed some consulting work for food companies in the past, does not demonstrate that they are a part of "special interest groups [that] may use their membership on [advisory committees]

to promote their private concerns," H.R. REP. No. 1017, at 6, *reprinted in* 1972 U.S.CODE CONG. & ADMIN.NEWS at 3496, about which Congress was concerned.

Only one of the six additional members of the Committee is employed by the food industry: Dr. David M. Theno, Jr., Director of Technical Services at Foster Farms. As noted, Dr. Calia is connected with a medical school. Three other members also have academic affiliations: Dr. David W. Dressen, Associate Professor, Department of Medical Microbiology, College of Veterinary Medicine, The University of Georgia; Dr. Merle D. Pierson, Department Head and Professor, Department of Food Science and Technology at Virginia Polytechnic Institute and State University; and Dr. Ranzell Nickelson, Adjunct Professor at Texas A & M University, and President of Applied Microbiological Services, Inc. The other new member is Dr. Catherine E. Adams, Special Assistant to the Administrator, Food Safety and Inspection Service, United States Department of Agriculture.

Opinion, concurring in the judgment, filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The Government argues that the district court lacked jurisdiction over this case because the question presented is not justiciable under the Administrative Procedure Act ("APA") and the Constitution, and because the appellants lack standing. I agree the issue is not justiciable and, applying virtually the same analysis, that the appellants lack standing because their injury—if it exists—is not redressable. Therefore, I concur in the judgment affirming the district court's dismissal order.

## I.

Appellants contend that the advisory committee formed by the United States De-

partment of Agriculture ("USDA") is not "fairly balanced in terms of the points of view represented and the functions to be performed," Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2 § 5(b)(2), because it lacks a "consumer representative." For any claim under section 5(b)(2) of the FACA to be justiciable under the APA, we must first conclude that Congress provided "a meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). Where no such meaningful standard exists, "the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely," thereby precluding judicial review under 5 U.S.C. § 701(a)(2). *See id.* I cannot discern any meaningful standard that is susceptible of judicial application in the formulation "fairly balanced in terms of the points of view represented and the functions to be performed." Therefore, I believe that judicial review is unavailable.

The relevant points of view on issues to be considered by an advisory committee are virtually infinite and, therefore, the judgment as to what constitutes an appropriate or "fair" balance of those views must be a political one. This kind of a decision is very similar to the one a chairman of a congressional committee must make when he or she determines which witnesses should be called to testify about proposed legislation. Thus, even before the points of view on an advisory committee can be balanced at all—"fairly" or otherwise—it must first be determined *which* points of view should be balanced. And I can conceive of no principled basis for a federal court to determine which among the myriad points of view deserve representation on particular advisory committees.[1] Perhaps

---

1. Judge Edwards passes without comment over this most formidable of hurdles when he analogizes this section of the FACA to the statute that the Supreme Court found to be susceptible of judicial review in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), that forbade federal financing of highways through parks unless no "feasi-

ble and prudent" alternative exists and unless "all possible planning to minimize harm to the park" was undertaken. *See separate opinion of Edwards, J.* at 434. If we knew which points of view were to be fairly balanced on an advisory committee, the case for justiciability might be stronger—though by no means clear—despite the imprecise nature of the phrase "fairly bal-

if one could hypothesize a situation in which only two or three points of view were relevant to a particular advisory committee, and if we could define those points of view with the requisite clarity, the question whether they were "fairly balanced" might be judicially reviewable—although I even have my doubts about that. Would the inclusion of one representative of a particular viewpoint be "fair" or would an even split between opposing viewpoints be required? Would a single representative of a viewpoint be enough if he were particularly persuasive? But surely, given the possible range of points of view on virtually any subject, an effort to reduce points of view to a few categories—as if they were political parties—is quite artificial and arbitrary. And once one recognizes that, it follows that judicial review of the application of this phrase is not available.

Appellants suggest that we should read section 5(b)(2)'s requirement that viewpoints be fairly balanced to mean that individuals or groups with a "direct interest" in the work of a particular committee are entitled to "some" representation on that committee. In other words, recognizing that balancing points of view is impossible, appellants would have us use "a direct interest" as a proxy for a point of view so that judicial review would be available. That approach—in which the plain language of the statute is distorted—is an example of the tail of judicial review wagging a statutory dog. It is true, however, that we have previously in *National Anti–Hunger Coalition v. Executive Committee*, 711 F.2d 1071, 1074 n. 2 (D.C.Cir.1983), at least suggested that construction. But even if the statute were so construed, I think it remains nonjusticiable because the phrase "direct interest"—in this context—is not definable.

In the first place, the line between those with "direct interests" and those with indirect or tangential ones is hopelessly manipulable. The courts would be obliged to make an arbitrary decision as to how attenuated an interest must be before it should

be classified as "indirect." It would thus be necessary to determine whether the term "interest" refers to economic, ideological, or intellectual interest (or all three). Are academics, for example, "directly interested" in the purpose of advisory committees working in their field? They *are* directly interested intellectually, but they may not have a financial interest in any of the committee's decisions.

Even if we could decide which groups or individuals possessed such a direct interest, we would be forced to engage in the utterly nonjudicial task of determining whether that interest enjoyed "some" representation on the committee. Clearly, "some" representation cannot mean "direct" representation; even the *National Anti–Hunger* court recognized that section 5 of the FACA "confers no cognizable personal right to an advisory committee appointment" on anyone, *see National Anti–Hunger Coalition*, 711 F.2d at 1074 n. 2, regardless of the directness of his interest in the committee's function. Is a court then to decide whether a committee included "some" representation of a given person or group by crudely dividing committee members into political, social, or economic status groups and then comparing the appointments with the status groups of those seeking representation? Or might the court examine the members' policy views on the relevant subject, and see how they compare with those of the person or group seeking representation? Before taking the former tack, the court must somehow identify which status groups ought to be represented on the committee in question, which, as I have argued, is itself a quintessentially political decision. Appellants would divide the world of those interested in microbiological food contamination into three "classes" (government, industry, and consumers), each of which it alleges must have representation on the Committee. But there surely are other appropriate divisions, and choosing the best one is a political task not properly undertaken by life-

anced." The Court in *Overton Park* was not forced to make any such threshold political de-

termination.

tenured, unelected federal judges. On the other hand, to examine a member's relevant policy views—which brings one back to "points of view" which the direct interest proxy was designed to avoid—the court must somehow determine whether the views of a particular committee member are sufficiently close to those of the appellants to deem them "representative." Again, I see no principled way to decide such a question. Would the court rule, for instance, that when two parties agree on a certain percentage (what percentage?) of issues (which issues?) one may be deemed "representative" of the other? Neither the statutory language nor the appellants' proffered "standard," therefore, offers us effective guidance to determine whether an advisory committee is "fairly balanced in terms of the points of view represented."

Judge Edwards believes that we are bound to conclude that the phrase "fairly balanced in terms of points of view represented" is justiciable because our prior precedent, *National Anti–Hunger Coalition v. Executive Committee*, 711 F.2d 1071 (D.C.Cir.1983), governs this issue. To be sure, we there tentatively concluded, as Judge Friedman observes, that exclusion from an advisory committee may cause injury-in-fact for Article III purposes to those excluded from a committee or those who claim to be inadequately represented provided they have a "direct interest in the committee's purpose," *National Anti–Hunger Coalition v. Executive Commit-*

*tee*, 711 F.2d at 1074 n. 2, but even that observation was *dicta* because we stated "[t]he standing question is a close one that we need not resolve to decide this appeal...." *Id.* at 1073–74. In any event, we did not discuss either the basic justiciability of the standard or the closely-related concept of redressability, another component of standing, and as such *National Anti–Hunger* is hardly precedent on these questions. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 119, 104 S.Ct. 900, 918, 79 L.Ed.2d 67 (1984); *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 800 (D.C.Cir.1987). To affirm the district court in *National Anti–Hunger*, (as in Judge Friedman's opinion in this case), it was, I suppose, not analytically essential to reach the justiciability issue, although I believe it the proper course for a federal court first to decide an apparent jurisdictional question.[2]

The instant case illustrates powerfully, in my view, the kind of arbitrary judgments courts would have to make to adjudicate claims under FACA's "fairly balanced" requirement. Appellants assert that, at minimum, *consumers* are affected by the work of this Committee and therefore *consumers* must have "some" representation on it.[3] Undeniably, consumers will be directly affected by the work of the Committee since it advises the Department of Agriculture on the desirable form and extent of federal regulation of food prod-

**2.** The Supreme Court's decision in *Public Citizen v. Department of Justice*, —— U.S. ——, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989), does not imply in any way that claims under section 5(b)(2) of the FACA are justiciable. *But see separate opinion of Edwards, J.* at 434. First, as Judge Edwards notes, the plaintiffs in that case alleged a violation, not of the "fairly balanced" requirement, but of the sections of the FACA requiring advisory committees to "file a charter [section 9(c) ], afford notice of its meetings, open those meetings to the public [section 10(a) ], and make its minutes, records, and reports available for public inspection and copying [section 10(b) ]." 109 S.Ct. at 2562–63. It is hardly surprising that the Court saw no issue of justiciability in the prospect of determining whether any of those rather concrete requirements had been violated or in fashioning appropriate relief. Second, the Supreme Court had no occasion to apply *any* sec-

tion of the FACA in *Public Citizen v. Department of Justice* since it held that the FACA did not even apply to the American Bar Association committee alleged to be violating its terms. *Id.* at 2572–73.

**3.** If we did adopt appellants' "some representation" test, the USDA's recent appointment to the Committee of one of Public Citizen's own nominees, Dr. Frank Calia, might render this case moot. If that appointment does not satisfy appellants' claim, I do not see how a court could resolve the case without opining on what *numerical* representation on the Committee constitutes a "fair[ ] balance." In their supplemental brief discussing Dr. Calia's appointment, appellants shift their argument away from the composition of the Committee as a whole, instead stressing that they are "troubl[ed]" because one of the Committee's two "working groups" still lacks a "consumer representative."

ucts, but I hardly think that proposition helps appellants' case. Everyone in the entire United States is a consumer of food products, so I do not understand why *any* American—including all those who have already been appointed to the Committee—would not legitimately be considered a consumer representative. Whatever else he or she may do, that hypothetical person is a consumer.

Appellants' brief defines a consumer representative as one who "works for or is associated with a consumer or public health organization." But why should an organization that labels itself a representative of consumers have any greater legal claim to placement on the Advisory Committee than any other individual American or organization who buys or eats food? Indeed, at oral argument, counsel for petitioner conceded that the name of an organization could not be determinative in judging whether an organization qualified as a consumer representative, thus implying that we as a court would have to determine which organizations or individuals qualified as bona fide "consumer representatives."

I think it rather obvious that appellants thereby wish the court either to decide, or simply to assume the resolution of a major political question of our time. Appellants represent one philosophical, ideological, and political view of consumer welfare. I think it fair to describe that view as one that typically urges greater governmental regulation of the production of goods or services in the marketplace. But that view is hardly the only one that claims to maximize consumer welfare. At the other end of the political-ideological spectrum are those individuals or organizations who generally oppose government regulation since the cost incurred translates into higher prices for consumers and they believe those higher prices exceed the benefits that regulation is likely to afford. This debate is one key element in the division between the two major political parties in the United States. As such, it is hardly open to a federal court to express its view on such an issue by determining which kind of organization or individual legitimately represents consumers.[4]

It may well be that some congressmen[5] and often the press use the term "consumer representative" to denote solely organizations such as appellants'. But that means only that appellants have been relatively successful in gaining political acceptance—at least in some quarters—for the proposition that consumers are better served by more regulation than by less. Typically, political or advocacy organizations use a name that suggests that they speak for a majority of citizens within the relevant constituency because, by that technique, they enhance their political clout. The contemporary political landscape provides many variations on this theme; the Moral Majority, the League of Women Voters, and the People for the American Way are just examples. I suppose it could be said that appellants, by claiming to speak for everyone who consumes food, have linguistically trumped all other advocacy organizations, but semantic claims notwithstanding, it is not up to the federal judiciary to decide how many Americans any such organization truly represents. In our system of government, that sort of question is implicitly determined by elections.

In short, I do not think that the FACA provides us with legal principles to determine whether a particular advisory commit-

---

**4.** Indeed, counsel for appellants conceded at oral argument that the economist Milton Friedman—presumably an opponent of most government regulation—might, at least facially, qualify as a consumer representative. In their brief, appellants assert that their position "is that the Committee lacks *any* consumer representatives, not that it lacks consumer representatives with certain specific viewpoints." But if consumer representatives can have diametrically opposed views about what constitutes consumer welfare, I do not see how a court can differentiate legitimate from illegitimate consumer representatives.

**5.** *See, e.g.,* H.R.REP. No. 1017, 92d Cong., 2d Sess. 6 (1972), U.S.Code Cong. & Admin.News 1972, p. 3491 (identifying "consumer groups" as among several groups not represented on an advisory council that the House Committee believed lacked a balanced representation of different points of view).

tee is "fairly balanced in terms of the points of view represented." Nor does appellants' claim that "consumer representatives" must have "some" representation offer a workable legal standard. I therefore believe that the USDA's attempt to strike a "fair balance[ ]" among the members of an advisory committee is an activity "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and thus unreviewable in federal court.[6]

## II.

Appellants also claim that the advisory committee in question is "inappropriately influenced ... by [a] special interest" in violation of section 5(b)(3) of the FACA because too many appointments were made to food industry executives. That section reads in full:

> (b) Any such legislation [establishing an advisory committee] shall ... (3) contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment[.]

This provision, on its face, is directed to the establishment of *procedures* to prevent "inappropriate" external influences on an already constituted advisory committee by outside special interests or the appointing body. I doubt very much that it has any applicability to a committee's *membership*. Indeed, the provision presupposes that an advisory committee is already in existence and "fairly balanced" in accordance with section 5(b)(2).

Assuming *arguendo* that section 5(b)(3) is relevant to committee membership I do not think it adds any meaningful standard for judicial enforcement for it is still dependent on the meaning of a value-laden, undefinable term. Even if a fairly balanced advisory committee can be thought to be one that is not inappropriately weighted in the direction of a "special interest," how would we determine, for instance, when an interest is "special" as opposed to "general?" "Special interest" may do as a political pejorative (typically referring to an interest of which the speaker disapproves), but I do not see how, at least in the context of this statute, we have any way to determine what it means for purposes of judicial review. Appellants suggest that if a member of the Committee has an economic stake in its recommendations, that constitutes a "special" as opposed to "general" interest. But everyone has an economic interest in the price of food, so that standard cannot distinguish special from general interest. It might be thought, however, that food industry employees and consultants have an added economic stake beyond those who simply pay for food, and that their interest can therefore be labeled "special" because it is not shared by the public at large. But in the same sense, any paid member of appellants' organization who is a candidate for membership on the Committee would have an economic interest in the work of the Committee—not shared by the public—and

---

**6.** Even if Congress did intend there to be judicial review of agency compliance with section 5(b)(2)—for instance, if it had expressly provided that the "fairly balanced" requirement could be enforced in federal court—I have serious doubts that such review would be constitutional. Congress may not constitutionally confer on the judiciary the power to make policy choices unguided by statutory standards. *See, e.g., Keller v. Potomac Elec. Power Co.*, 261 U.S. 428, 444, 43 S.Ct. 445, 449, 67 L.Ed. 731 (1923) (concluding, in review of statute authorizing *de novo* Supreme Court review of ratemaking proceedings, that "[s]uch legislative or administrative jurisdiction ... can not be conferred on this Court either directly or by appeal."); *Green v. Frazier*, 253 U.S. 233, 240, 40 S.Ct. 499, 501, 64

L.Ed. 878 (1920) (suggesting that question of whether states have used their taxing powers for "public purposes" is not fit for judicial resolution; "[q]uestions of policy are not submitted to judicial determination, and the courts have no general authority of supervision over the exercise of discretion which under our system is reposed in the people or other departments of government."). *See also United States Dep't of Justice v. Reporters Comm.*, —— U.S. ——, 109 S.Ct. 1468, 1483–85, 103 L.Ed.2d 774 (1989) (rejecting a statutory interpretation that would require federal judges to conduct case-by-case, ad hoc balance of individuals' privacy interest against the public interest in the disclosure of certain information).

therefore a special interest. I dare say that virtually anyone in the United States gainfully employed or with some investments would have, in appellants' terms, a special interest with regard to some—perhaps all—advisory committees. For that matter, why shouldn't a group with an ideological rather than an economic stake—the Sierra Club or the National Rifle Association, for example—be considered a "special interest?" How should we go about classifying these interests? And what legally discernible principles could be employed to determine when a particular special interest is overly represented—when its influence is "inappropriate?"

Perhaps our task would be marginally less daunting if we accepted appellants' assumption that every member of the Committee will express views on matters before the Committee that reflect his or her employer's interest. But that may or may not be so. Congress did not provide for advisory committees balanced in accordance with sources of income, but rather in accordance with points of view. Surely not everyone employed by or consulting for organizations that have a definable economic stake in the Committee's recommendations will have a predictable view. Indeed, even organizations with ostensibly shared economic or ideological interests may well differ as to the desirable degree of regulation. It is not unknown for certain large corporations to be the most zealous advocates of increased regulation.

In sum, I do not think that recourse to section 5(b)(3) makes the case any more justiciable than it was under section 5(b)(2). Under both subsections appellants ask us to make a policy judgment, and an arbitrary one at that, as to the optimum character of the Advisory Committee. In my view, both subsections are "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Heckler v. Chaney*, 470 U.S. at 830, 105 S.Ct. at 1655, and therefore the USDA's actions are committed to its discretion by law and exempted from judicial review by section 701(a)(2) of the APA.

### III.

For the very reason that this case is nonjusticiable, appellants lack standing to sue. Their injury, even assuming it exists, is not redressable unless the court takes a series of leaps long enough to try the faith of any believer. A court attempting to fashion a decree to vindicate appellants' claim would be forced, either overtly or impliedly, to make the same arbitrary policy judgments described above. For instance, ordering the USDA to place one "consumer representative" on the Committee would mean that the court had decided (1) that consumers of food (*i.e.* everyone) are one of the groups among which the USDA *should* have balanced when forming the Committee; (2) that consumers of food are not currently represented on the Committee; (3) that the existing balance of viewpoints on the Committee is not fair; and (4) that adding one (or six or ten) "consumer representative(s)" would make that balance fair. Moreover, such an order would necessarily assume that there is such a thing as an identifiable consumer perspective to be represented, a problematic assumption to say the least. Judge Edwards' suggestion that redressability is not a problem because the court may simply enjoin the operation of the committee until adequate consumer representation is appointed begs the essential question in my view, since he does not explain how "consumer representative" would be defined—other than to suggest that he or she should possess "a background in consumer issues," *separate opinion of Edwards, J.,* at 437. The difficulty in redressing the appellants' alleged injury is analytically identical to adjudicating their claim in the first instance, a task, as I have indicated, that I think a court cannot perform.

\* \* \* \* \* \*

Therefore, I concur in the judgment affirming the district court's order dismissing appellants' complaint.

EDWARDS, Circuit Judge, concurring in part and dissenting in part:

This case involves a claim by the plaintiffs-appellants, five consumer organiza-

tions and one senior citizen research and advocacy organization (collectively, "Public Citizen"), that the lack of consumer representation on the National Advisory Committee on Microbiological Criteria for Foods ("the Committee") violates section 5 of the Federal Advisory Committee Act ("FACA" or "the Act"), 5 U.S.C. App. 2 § 5(b)(2), (3) (1982). The District Court dismissed the case, finding that the plaintiffs had "offered no specific evidence that their viewpoints are not adequately represented by the Committee." *Public Citizen v. National Advisory Comm. on Microbiological Criteria for Foods*, 708 F.Supp. 359, 364 (D.D.C.1988).

Judge Friedman and Judge Silberman have voted separately to affirm. Judge Friedman agrees with the District Court that the plaintiffs have not made out their claim on the merits, and Judge Silberman has concluded that the plaintiffs lack standing and that their claim is not justiciable. Because I believe that the question presented is justiciable, that Public Citizen does have standing and that the absence of any consumer representative on the Committee violates FACA, I would reverse the judgment of the District Court and remand the case for further consideration.

## I. Justiciability

Under section 10(a) of the Administrative Procedure Act ("APA"), agency action is judicially reviewable

> except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law.

5 U.S.C. § 701(a) (1982). Over the years, the Supreme Court and this court have emphasized that preclusion is a very *narrow exception* under the APA, not the norm. In other words, section 10 "creates a strong presumption of reviewability that can be rebutted only by a clear showing that judicial review would be inappropriate." *Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031, 1043 (D.C. Cir.1979). As the Supreme Court explained in *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 106 S.Ct. 2133, 90

L.Ed.2d 623 (1986), the reason for this rule is that

> [w]e ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive violates such a command.

*Id.* at 681, 106 S.Ct. at 2141. *See also Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975) (discussing the presumption of reviewability as it relates to APA section 701(a)(1)); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (discussing the presumption of reviewability as it relates to APA section 701(a)(2)); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967) (noting that the APA "embodies the basic presumption of judicial review").

There is no claim here, nor could there be, that Congress expressed an intention to preclude review of appointments made pursuant to section 5 of FACA. Therefore, the plaintiffs' suit is not barred by section 10(a)(1) of the APA. So the only question at issue is whether, as Judge Silberman contends, this suit is barred by section 10(a)(2) of the APA because the agency action at issue "is committed to agency discretion by law." Under this view, one must find that the "fairly balanced" requirement in section 5 of FACA "'committed' the decisionmaking to the agency's judgment absolutely." *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). On the record of this case, such an interpretation simply cannot be supported, either by reference to the terms of FACA or pursuant to the case law construing section 10(a)(2) of the APA.

In order for the "committed to agency discretion" exception to preclude judicial review altogether, the Government must establish that "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 at 830, 105 S.Ct. at 1655. *See also Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 2052, 100 L.Ed.2d 632 (1988) (same). This standard

has been understood to mean that judicial review is precluded under section 10(a)(2) only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Overton Park*, 401 U.S. at 410, 91 S.Ct. at 821 (quoting S.REP. No. 752, 79th Cong., 1st Sess. 26 (1945)). There is nothing in FACA or its legislative history to indicate that the "fairly balanced" requirement affords executive discretion sufficient for us to find that "there is no law to apply." Indeed, just the opposite is true, because it is clear that Congress enacted the "fairly balanced" requirement to constrain executive discretion and to establish a measurable standard against which to judge executive action. In short, this is not a case like *Webster v. Doe*[1] in which the applicable statutory standard "exudes deference" to the agency and thus "foreclose[s] the application of any meaningful judicial standard of review." 108 S.Ct. at 2052.

As Judge Friedman's opinion notes, this court already has found that FACA's legislative history makes clear that

> the "fairly balanced" requirement was designed to ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee. *See* S.REP. No. 1098, 92d Cong., 2d

Sess. 9 (1972); H.R.REP. No. 1017, [92d Cong., 2d Sess. 6 (1972)]. When the requirement is ignored, therefore, persons having a direct interest in the committee's purpose suffer injury-in-fact sufficient to confer standing to sue.

*National Anti–Hunger Coalition v. Executive Committee of the President's Private Sector Survey on Cost Control*, 711 F.2d 1071, 1074 n. 2 (D.C.Cir.1983).[2] The question of justiciability of claims under section 5 of FACA is thus not an open issue in this circuit.[3]

Furthermore, just this past Term, the Supreme Court reviewed the legislative history of FACA and concluded that the Act's "principal purpose was to enhance the public accountability of advisory committees established by the Executive Branch and to reduce wasteful expenditures on them." *Public Citizen v. Department of Justice*, —— U.S. ——, 109 S.Ct. 2558, 2568, 105 L.Ed.2d 377 (1989). In analyzing a claim arising under the section of FACA that provides for access to meetings and records, the Court in *Public Citizen* never expresses even the slightest doubt over the justiciability of the plaintiffs' suit. Nor can any be expressed here. If, as the Supreme Court has told us, FACA is designed to ensure "public accountability" on the part of the Executive Branch, it is reasonable to assume that Congress "ex-

---

1. In *Webster v. Doe,* the Court concluded that the statutory standard—which allowed termination of an Agency employee whenever the Director "shall deem such termination necessary or advisable"—"fairly exudes deference" to the administrative official, and that both the language and the legislative history exhibit "extraordinary deference" to the Director in his decision to terminate individual employees. 108 S.Ct. at 2052–53 (quoting section 102(c) of the National Security Act). Neither the language nor the legislative history of the "fairly balanced" requirement of FACA section 5 exhibit this kind of deference in selection of Advisory Committee members.

2. The Senate report accompanying the legislation subsequently enacted as the Federal Advisory Committee Act notes that federal advisory committees often "do not adequately and fairly represent the public interest, [and] that they may be biased toward one point of view or interest." S.REP. No. 92–1098, 92d Cong., 2d Sess. 5 (1972). The report goes on to character-

ize the fair balance provision as "requir[ing] that membership of the advisory committee shall be representative of those who have a direct interest in the purpose of such committee." *Id.* at 9. There is no mention of any broad executive discretion in the selection of persons to serve on advisory committees.

3. A number of claims under section 5 of FACA have been pursued in the District Court. *See, e.g., National Anti–Hunger Coalition,* 557 F.Supp. 524 (D.D.C.1983) (Executive Committee of the President's Private Sector Survey on Cost Control), *aff'd,* 711 F.2d 1071 (D.C.Cir.1983); *National Anti–Hunger Coalition,* 566 F.Supp. 1515 (D.D.C.1983) (Executive Committee of the President's Private Sector Survey on Cost Control); *National Treasury Employees Union v. Reagan,* Civ. Action No. 88–186, 1988 WL 21700 (D.D.C. Feb. 26, 1988) (President's Commission on Privatization); *National Ass'n of People with AIDS v. Reagan,* Civ. Action No. 87–2777–OG, 1988 WL 36143 (D.D.C. Dec. 17, 1987) (Commission on Human Immunodeficiency Virus Epidemic).

pects the courts to grant relief when an executive agency violates [the statutory] command." *Bowen,* 476 U.S. at 681, 106 S.Ct. at 2141.

It does not matter that the "fairly balanced" requirement falls short of mathematical precision in application, or that it may involve some balancing of interests by the agency. The presumption in favor of judicial review is not altered in the face of a diffuse statutory directive. Indeed, this one of the principal points of the Supreme Court's decision in *Overton Park.* In that case, the Court allowed a suit under a statute that prohibited the Secretary of Transportation from authorizing the use of federal funds to finance the construction of highways through public parks if a "feasible and prudent" alternative route exists and allowed construction through parks only if there has been "all possible planning to minimize harm" to the park. *Overton Park,* 401 U.S. at 411, 91 S.Ct. at 821. The "feasible and prudent" and "minimize harm" standards involved a significant and ill-defined weighing of interests by the agency, just as does the "fairly balanced" standard in this case. However, as the Court made clear, this did *not* mean that there was "no law to apply." *Id.* at 410–13, 91 S.Ct. at 820–22. While the difficulty of determining what precisely constitutes a "fair balance" may incline courts to be deferential in reviewing the composition of advisory committees and may defeat a plaintiff's claims in a given case, this cannot be grounds for refusing to enforce the provision altogether. "When the [fair balance] requirement is ignored, persons having a direct interest in the committee's purpose suffer injury-in-fact sufficient to confer standing to sue." *National Anti–Hunger Coalition,* 711 F.2d at 1074 n. 2. The courts therefore have a duty to hear and decide such cases. Judicial responsibility cannot be abdicated merely because a case poses a difficult question for resolution.

## II. Standing

It has been suggested that even if the plaintiffs' claim is justiciable, they have no standing to sue in this case. The doctrine of standing encompasses three separate requirements: a distinct and palpable injury, an injury "fairly traceable" to the challenged action and an injury likely to be redressed by the requested relief. *See, e.g., Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The concurring opinion questions the plaintiffs' standing on the third ground—redressability—arguing that there should be no standing because a court would be forced to make arbitrary policy judgments in assessing the balance of the Committee. It is clear, however, that there is no basis to deny standing in this case. The Supreme Court's recent decision in *Public Citizen v. Department of Justice,* —— U.S. ——, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989), makes this point quite clear.

First, it is important to note that, for purposes of standing, we need not determine whether the membership of the Committee is or is not fairly balanced. As this court noted in *Metcalf v. National Petroleum Council,* in assessing standing, "we are required to 'accept as true all material allegations of the complaint....'" 553 F.2d 176, 180 (1977) (quoting *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)).

Second, there are no problems here with redressability. The plaintiffs contend simply that the Committee must have some consumer representation in order to meet the "fairly balanced" requirement. The alleged injury from the lack of *any* consumer representative is easily remedied by the relief requested by Public Citizen—an injunction suspending operation of the Committee until consumers are represented on it.

Finally, the Supreme Court's recent decision in *Public Citizen v. Department of Justice,* —— U.S. ——, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989), confirms that the plaintiffs do have standing. Analyzing a section of FACA that provides for access to meetings and records, the Supreme Court concluded that even though many of these meetings might be legitimately closed to the public and many documents might be

shielded from public view, a ruling in the appellants' favor would allow *some* increased notice and access to information. *Id.* 109 S.Ct. at 2564. The Court held that, with regard to redressability, these "potential gains are undoubtedly sufficient to give them standing." *Id.* (footnote omitted). Similarly, in this case, it does not matter that every one of the plaintiffs' preferred viewpoints might not be represented on the Committee or that they might not be afforded the precise extent of representation sought on the Committee. Their "potential gains" of some representation are sufficient to give them standing. *Id.*[4]

### III. MOOTNESS

I agree with Judge Friedman that the Department of Agriculture's recent appointment to the Committee of one of Public Citizen's nominees, Dr. Frank Calia, does not render this case moot. As Judge Friedman correctly notes, there is still an "actual controversy" between the parties over the legality of the Committee's composition, despite the addition of Dr. Calia to the Committee.

In my view, however, this court is in no position to consider the appointment of Dr. Calia in weighing the merits of this case. An appellate court ordinarily has no factfinding function, as this circuit has noted repeatedly. *See, e.g., National Anti-Hunger Coalition,* 711 F.2d at 1075; *Goland v. CIA,* 607 F.2d 339, 371 (D.C.Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980).

It cannot receive new evidence from the parties, determine where the truth actu-

ally lies, and base its decision on that determination. Factfinding and the creation of a record are the functions of the district court; therefore, the consideration of newly-discovered evidence is a matter for the district court.

*Goland,* 607 F.2d at 371.

Judge Friedman may be right that Dr. Calia's recent appointment to the Committee shows that the Committee is "fairly balanced." But we are in no position to decide this question, especially in the face of the strongly competing claims of the parties concerning the effect of Dr. Calia's appointment. I would refer this matter to the District Court for consideration on remand.

### IV. THE MERITS

As Judge Friedman's opinion sets forth, the appropriate inquiry in determining whether the Committee's membership satisfies the "fairly balanced" standard in section 5(b)(2) is "whether the Committee's members 'represent a fair balance of viewpoints given the functions to be performed'" (quoting *National Anti–Hunger Coalition,* 711 F.2d at 1074). The *function* of the Committee has played a critical role in the outcome of previous decisions, and is the basis for my divergence from the panel opinion over whether the Committee is "fairly balanced" absent any representative of consumer interests on the record before us.

In applying section 5, courts have paid special attention to the mandate of the advisory committee. Thus, in *National Treasury Employees Union v. Reagan,*

---

**4.** The Government also claims that the appellants run afoul of the prudential rule barring adjudication of generalized grievances more appropriately addressed to the representative branches. The appellants in this case, however, are not claiming such a generalized grievance. The appellants claim that they have been denied their right to representation. This is not an abstract psychological or ideological injury of the kind that defeats standing on prudential grounds. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Standing is not found wanting because an injury has been suffered by many.

The Supreme Court rejected a similar argument in *Public Citizen v. Department of Justice:* "The fact that other citizens or groups of citizens might make the same complaint after unsuccessfully demanding disclosure under FACA does not lessen appellants' asserted injury...." 109 S.Ct. at 2564. The Court applies the reasoning of its decisions interpreting the Freedom of Information Act ("FOIA") noting that these decisions "have never suggested that those requesting information under [FOIA] need show more than that they sought and were denied specific agency records." *Id.* The plaintiffs in this case have alleged that they sought and were denied their right to representation.

Civ. Action No. 88–186, slip op. at 9–10, 1988 WL 21700 at 8–9 (D.D.C. Feb. 26, 1988), the District Court determined that the Commission need not include a critic of privatization where the function of the Commission was primarily to study and report on which activities of the federal government are more appropriately part of the private sector, rather than to determine whether privatization is a good policy. Similarly, in *National Anti–Hunger Coalition*, this court held that a commission composed entirely of leaders of private industry was not unbalanced when the purpose of the commission was to apply private sector expertise to the task of improving the cost-effectiveness of the federal government. *See* 711 F.2d at 1074. On remand, however, the District Court determined that the commission had strayed from its narrow area of cost and management control into more substantive legislative policy issues affecting the rights of recipients of federal food benefits, who were not represented on the commission. In this respect, the court found the commission unbalanced, in violation of FACA. *See National Anti–Hunger Coalition*, 566 F.Supp. 1515, 1517 (D.D.C.1983).

In the instant case, the Committee is charged with recommending "microbiological criteria by which the safety and wholesomeness of food can be assessed, including criteria for microorganisms that indicate whether foods have been processed using good manufacturing practices." 52 Fed.Reg. 43,216 (1987). This is precisely the type of committee on which Congress believed that consumer representation was important. Congress saw a specific need for public interest representation on committees involved in issues of public concern.

The report accompanying the House version of FACA identified as an example of a committee that would not meet the "fairly

balanced" requirement one established to propose a national industrial wastes inventory questionnaire but which contained predominantly "representatives of industry" and excluded persons representing "conservation, environment, clean water, consumer, or other public interest groups." H.R. Rep. No. 1017, 92d Cong., 2d Sess. 6 (1972), U.S.Code Cong. & Admin.News 1972, p. 3491 [hereinafter House Report]. Food contamination affects consumers at least as directly as a national industrial wastes inventory and, although scientific and technical expertise is essential in both instances, the need for technical expertise does not negate the requirement of fairly balancing points of view. *Cf.* National Academy of Sciences, Meat and Poultry Inspection, The Scientific Basis of the Nation's Program 160 (1985) (concluding that in some cases the "low level of communication with communities outside industry can lead to inappropriate decisions that may affect public health").

The Committee at issue in this case is charged with recommending regulations for a broad range of food products. These decisions have health and safety implications that directly affect consumers. Recommendations regarding these regulations involve complex policy choices, not merely—or even primarily—technical determinations. For these reasons, especially in light of the legislative history of section 5, I disagree with Judge Friedman's opinion that the Committee's mandate in this instance was "primarily technical and scientific," and I conclude that a fair balance of viewpoints cannot be achieved without representation of consumer interests.[5]

This leads to a second point: whether consumer interests *are* represented on the Committee as composed on the record before us. The District Court made no finding whether consumers are represented on

---

**5.** Judge Silberman's opinion is concerned about the difficulty of defining "consumer" or "public interest" in light of the divergence in viewpoints held by persons or individuals that claim to represent such interests. Similarly, the District Court observed that FACA cannot be read to require *every* type of consumer group that may be affected by the Committee's work to be included among its members. *See Public Citizen v. National Advisory Comm. on Microbiological*

*Criteria for Foods,* 708 F.Supp. 359, 363 & n. 7 (D.D.C.1988). As noted above, however, the plaintiffs are not seeking to have *every* consumer viewpoint represented but simply to have *some* consumer representation on the Committee. The plaintiffs acknowledged at oral argument that they have no right to insist that the Government appoint consumer representatives who share their own precise viewpoints.

the Committee; it simply found that the plaintiffs had presented no evidence that their viewpoints were not represented. *See Public Citizen v. National Advisory Comm. on Microbiological Criteria for Foods,* 708 F.Supp. at 363–64. This is the wrong standard. Congress clearly did not intend courts to inquire into the specific opinions of every committee member in order to determine if a committee is unbalanced. Rather, it accepted that a person's viewpoints could be inferred from his or her background and employment status. Thus, the House Report described the commission on national industrial wastes inventory as defective merely because its *members* were representatives of industry, not because the *opinions* held by its individual members were unrepresentative. *Cf.* HOUSE REPORT at 6. Similarly, Senator Monagan, in introducing Senate debate on the bill, explained:

> [T]he most important provision here is the one which requires fair representation of different points of view upon any advisory commission, so that they will not all be educators on committees in the Department of Education and will not be all scientists, physicians, or medical men on commissions relating to the Institutes of Health.

118 CONG.REC. 16,296 (1972).

As the legislative history indicates, Congress intended "balance" to be judged by the members' employment status and background, not their professed personal opinions. Nothing in the Act or its legislative history even slightly indicates that Congress intended the presence or absence of balance to turn on an inquiry into the opinions of individual members. Indeed, the Government has itself acknowledged that one can presume that industry representatives will tend to represent industry interests. *See* Tr. of Preliminary Injunction (Sept. 22, 1988) at 27–31, *reprinted in* Joint Appendix at 43–47. The converse also holds; if none of the Committee members has a background in consumer issues, then the Committee is unbalanced within the meaning of FACA, without regard to the specific views of the members.

The Government argues that consumers are represented by Dr. Martha Rhodes, the Assistant Commissioner of Agriculture for the Florida Department of Agriculture and Consumer Affairs, and by Dr. Mitchell Cohen of the Centers for Disease Control. Both of these persons, however, are government employees with a variety of regulatory responsibilities. One of the dangers that Congress specifically identified in adopting FACA was the risk that governmental officials would be unduly influenced by industry leaders. *See, e.g.,* HOUSE REPORT at 6; 118 CONG.REC. 30,280 (1972) (remarks of Sen. Roth); Report by E. Winslow Turner, Special Counsel to the Intergovernmental Relations Subcommittee, *reprinted in* 118 CONG.REC. 30,276 (1972). That is, it is precisely the lack of representatives of the public interest independent of *both* government *and* industry that prompted Congress to enact the "fairly balanced" provision. The fact that Dr. Rhodes and Dr. Cohen are state rather than federal government officials does not demonstrate that they will be less amenable to influence by industry representatives. This is not to impugn the integrity of either individual. Rather, it is to say that it is unnecessary for the court to assess the individual viewpoints of Dr. Rhodes and Dr. Cohen in order to find that their presence does not mitigate the lack of consumer representation. I, thus, conclude that, on the record before us, the Committee does not include any representative of consumer interests and, consequently, that it is not "fairly balanced" as required by section 5 of FACA.

## V. CONCLUSION

The plaintiffs have alleged that the Government has denied them their statutory right to representation on the Committee. This injury is redressable and is sufficient under both the constitutional and prudential limitations on standing. The alleged violation of section 5 of FACA is also judicially cognizable, because the statute and legislative history together provide courts with standards to apply in interpreting the provision.

On the merits, I believe that the plaintiffs have made out their claim that the complete absence of consumer representa-

tion violates the "fairly balanced" provision of section 5. Of course, FACA does not require a consumer representative on every federal advisory committee. As prior cases have shown, at times it may be perfectly appropriate to have an advisory committee composed largely or exclusively of representatives of private industry or some other private interest. *See, e.g., National Anti–Hunger Coalition,* 711 F.2d at 1074; *National Treasury Employees Union v. Reagan,* Civ. Action No. 88–186, slip op. at 9–10, 1988 WL 21700 at 8–9 (D.D.C. Feb. 16, 1988). The present case, however, involves a Committee that has been charged with recommending appropriate regulation of an industry for the benefit of the public health. This is precisely the type of situation with respect to which Congress feared industry domination and saw a need for independent consumer or other public interest representation.

I would remand the case to the District Court for further review on the merits, using the proper legal standard to assess whether the Committee is "fairly balanced." On remand, the trial court could consider whether the recent appointment of Dr. Calia moots the plaintiffs' suit.