PUBLIC CITIZEN, et al., Plaintiffs,

v.

DEPARTMENT OF HEALTH AND
HUMAN SERVICES,
Defendant.

Civ. A. No. 92–0326.

United States District Court,
District of Columbia.

May 28, 1992.

Patti A. Goldman, Washington, D.C., for plaintiffs.

Gail Walker, Civ. Div., Dept. of Justice, Washington, D.C., for defendant.

MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

This case is brought by Public Citizen, the National Resources Defense Council, the Center for Science in the Public Interest, and the California Environmental Protection Agency's Office of Environmental Health Hazard Assessment against the Department of Health and Human Services (HHS) for the alleged violation of the Federal Advisory Committee Act (FACA), 5 U.S.C.App. § 5(b)(2) & (c). Before the Court are defendant's motion to dismiss and plaintiffs' cross motion for summary judgment. For the reasons that follow, this Court shall grant defendant's motion and deny plaintiffs' motion and dismiss this case.

## BACKGROUND

The material facts are not in dispute. On November 20, 1989, the Secretary of HHS, Louis Sullivan, chartered the Advisory Committee on the Food and Drug Administration (FDA Advisory Committee or the Committee) for the purpose of examining "the mission, responsibilities and structure of the FDA according to its legislative mandate and to make recommendations on how the Agency can be strengthened to fulfill its mission." *See* Plaintiffs' Exhibit 21 (Charter of the Advisory Committee on the Food and Drug Administration) (hereinafter Charter). The Committee was originally structured to have 13 members appointed by the Secretary. On April 4, 1990, the Secretary amended the Charter to add four members and give the Committee additional time to accomplish its assigned tasks. The Charter expired just over a year later, with the issuance of the Committee's May 1991 Final Report. *See* Plaintiffs' Exhibit 30 (Final Report of the Advisory Committee on the Food and Drug Administration, May 1991) (hereinafter Final Report).

Plaintiffs' complaint takes issue with one of the recommendations in the final report: the recommendation that Congress pass legislation preempting additional and conflicting state requirements for all products subject to FDA jurisdiction. The Committee's recommendation includes a procedure whereby states may seek exemption from preemption in areas in which the FDA has acted, based on "convincing local need." Additionally, the recommendation provides that in areas in which the FDA has not acted, a state that wishes to act must notify the FDA and give it 120 days to respond. Finally, the recommendation provides that states should be allowed to petition for the adoption or amendment of national standards. The FDA Advisory Committee additionally recommended that if Congress does not pass preemption legislation by the end of the 102nd Congress, then the FDA should issue a preemption regula-

tion accomplishing the same goals. *See* Final Report at 49–53.

Plaintiffs argue that the FDA Advisory Committee acted *ultra vires* by making the preemption recommendation because the Committee is not "fairly balanced in terms of the points of view represented and the functions to be performed," as required by the FACA, 5 U.S.C.App. § 5(b)(2) & (c). Plaintiffs argue that in order for the Committee to make a recommendation involving states' rights and interests, the FACA requires that the Committee include representatives of states' interests. The FDA Advisory Committee allegedly contains no such members.[1] Thus, plaintiffs seek a declaration that the Committee's recommendation regarding preemption is null and void. They also seek an injunction requiring HHS to amend the Final Report to delete the recommendation and to notify those who have received copies that the recommendation has been deleted.

The government advances three arguments in support of its motion to dismiss: (1) that plaintiffs' claim is nonjusticiable because of the lack of a judicially manageable standard of review of the "fair balance" requirement; (2) that plaintiffs lack standing to pursue their claim; and (3) that, on the merits, the Secretary did not abuse his appointment discretion in appointing the members of the FDA Advisory Committee.

## DISCUSSION

### A. The Case Law

The FACA "fair balance" requirement has been addressed by this circuit on four occasions (and more frequently by the district court). Unfortunately, the decisions that have been rendered thus far have resulted in a legal quagmire with no coherent guidelines for district courts to follow.

The first case to address the issue was *Metcalf v. Nat'l Petroleum Council*, 553 F.2d 176 (D.C.Cir.1977) (Wilkey, J., writing

---

**1.** A list of the Committee members is attached as an Appendix to this Memorandum Opinion. The members come from academia, research foundations and organizations, and private in-

dustry. They include Ph.D.s, M.D.s, and at least one lawyer. Many members work in the industries regulated by the FDA and some are former FDA officials.

for Tamm & MacKinnon, J.J.). In that case, a U.S. senator, Lee Metcalf, and a private citizen, Robert Brown, brought suit to enjoin the National Petroleum Council (NPC) from operating as a federal advisory committee because its membership allegedly was not "fairly balanced" within the requirements of the FACA. Specifically, plaintiffs alleged that the NPC, made up entirely of petroleum industry representatives, was inappropriately influenced by special interests. Judge Pratt dismissed the case for lack of standing and the circuit court affirmed.

In *Metcalf*, the private citizen argued that citizens and consumers were injured by the NPC's composition because, as a result of the influence of the petroleum industry, the NPC would make recommendations that would result in higher prices for petroleum products, a lack of policy interest in alternative energy sources, and a threat to citizens' health and safety because of the environmental damage associated with petroleum products. The circuit court held that these alleged injuries did not rise to the "injury in fact" required for standing because "the occurrence of the asserted harm is speculative and conjectural *in the purest sense*." 553 F.2d at 186. Plaintiffs' own allegations mandated this conclusion: their claims rested on the theory that the unbalanced membership of the NPC "causes it to make certain biased recommendations, which in turn cause government agencies to adopt policies favoring the petroleum industry, which in turn cause the appellants to be injured as consumers and citizens." *Id.* at 185. This speculative chain of events was simply too attenuated to amount to injury in fact.

The circuit court reached the same conclusion with respect to the alleged injuries of Senator Metcalf. He argued that, as a member of the Senate Committee on Interior and Insular Affairs and Chairman of its Subcommittee on Minerals, Materials and Fuels, the subcommittee's work suffered because of the allegedly tainted and biased advice of the NPC. The court held that the senator had "alleged no '*particular* concrete injury' which amounts to 'a claim of *specific* present *objective* harm or a threat

of *specific* future harm.'" *Id.* at 188 (citations omitted) (emphasis in original). Rather, he presented only a generalized grievance that one of the sources of information to the subcommittee was not of the quality it should be.

Finally, in affirming the district court's dismissal of the case, the circuit stated:

The Supreme Court has stated that the standing doctrine "is founded in concern about the proper—and properly limited—role of the courts in a democratic society." The requirements relating to standing have been developed to ensure that a party invoking a federal court's jurisdiction does not do so in a manner inconsistent with the Constitution or sound prudential limitations. If we were to accept appellants' speculative, conjectural, generalized injuries in this case as sufficient for standing we would be called upon to supervise the membership and funding of federal advisory committees on a continual basis and to alter the composition of these committees according to our subjective determinations as to "fair balance." Such a role as the "continuing monitors of the wisdom and soundness of Executive action" is clearly inappropriate for the courts.

*Id.* at 190 (citations omitted).

The next case to address the FACA "fair balance" requirement is remarkably similar to the case before the Court today. In *Physician's Education Network, Inc. v. Dep't of Health, Education and Welfare, et al.,* 653 F.2d 621 (D.C.Cir.1981) (per curiam) (MacKinnon, Mikva & Edwards, J.J.), the circuit court again affirmed Judge Pratt's dismissal of a FACA case based on lack of standing. In this case, the plaintiff was an organization representing the interests of ophthalmologists. It sought the rescission of a report issued by the Secretary of the Department of Health, Education and Welfare (HEW) recommending that Medicare reimbursement for eye care limited to services performed by ophthalmologists be extended to certain services performed by optometrists. The report was prepared with the assistance of a panel of consultants. Plaintiff argued that the

panel was constituted in violation of the FACA because the Secretary of the HEW had selected for the panel a majority of people who represented the interests of optometrists. The district court held, and the appellate court agreed,[2] that it was unnecessary to determine whether the optometrists had established injury in fact because it was clear that granting the relief requested would not redress the injury complained of. Judge Pratt's analysis is particularly relevant to the case now before the Court:

> According to plaintiff's allegations, the injury complained of here will occur *only* upon passage by Congress and signing into law by the President of legislation extending the medicare coverage as recommended in the 1976 report prepared by defendant HEW. To conclude that plaintiff has standing to maintain this action, it is therefore necessary for us to find that it is substantially likely that Congress will not pass the expansion of medicare coverage *if we declare the 1976 report in violation of certain regulations, statutory provisions, and/or constitutional requirements and accordingly order it rescinded.* Only speculative inferences could lead us to such a conclusion because the record does not carry us that far, and "unadorned speculation will not suffice to invoke the judicial power."

653 F.2d at 627 (reprinting district court opinion) (emphasis in original). The district court concluded that the injury complained of, if it ever were to occur, would result from action by Congress, which as an independent third party was not before the court.[3]

As happens, the next district judge to address the FACA "fair balance" require-

ment reached a different conclusion with respect to standing. In *Nat'l Anti–Hunger Coalition, et al. v. Executive Committee of the President's Private Sector Survey on Cost Control, et al.*, 557 F.Supp. 524 (D.D.C.1983), *aff'd*, 711 F.2d 1071 (D.C.Cir.1983), *j'ment amended*, 566 F.Supp. 1515 (D.D.C.1983), plaintiffs were individual recipients of federal food assistance benefits and the National Anti–Hunger Coalition. They alleged that the Executive Committee of the President's Private Sector Survey on Cost Control (the Executive Committee), which was established to conduct in-depth reviews of the Executive Branch operations and advise the President, the Secretary of Commerce, and other agency heads about cost control, had violated the FACA because its membership was not "fairly balanced" as required by the Act. The Executive Committee was made up of 150 members, virtually all of which were executives of major corporations. Plaintiffs alleged that the committee lacked balance because there were no public interest advocates or beneficiaries of federal food assistance programs on the committee.

Interestingly, Judge Gesell held that plaintiffs had standing to challenge the composition of a federal advisory committee under § 5(b) of the FACA. *See* 557 F.Supp. at 527. First, Judge Gesell noted that numerous recent cases indicated that plaintiffs have standing to challenge the open meeting provisions of the FACA under § 10. He then cited the circuit court's opinion in *Physician's Education Network* as having held, in *dicta*, that a plaintiff denied actual representation on an advisory committee would have standing under the FACA.[4] Finally, Judge Gesell postulated

---

**2.** The circuit explicitly adopted the district court's opinion and set it forth as an appendix to the circuit decision. *See* 653 F.2d at 623.

**3.** In fact, Congress did pass legislation expanding Medicare coverage. This legislation was passed before the circuit court decided the appeal from Judge Pratt's decision. The circuit court noted that the passage of the legislation "only strengthens the district court's conclusion that there is no substantial likelihood that re-

scission of the report will redress the injury of Physicians' members." 653 F.2d at 623.

**4.** This Court interprets the *dicta* from *Physician's Education Network* somewhat differently. What the circuit court actually said, in *dicta*, was that "Physicians' does not allege that it sought and was denied participation in the panel's meetings, or that it sought and was denied representation on the panel itself." 653 F.2d at 623. The court then noted that "[a]llegations of this kind" had been sufficient to support stand-

that there was no distinction readily apparent between § 10 and § 5 of the FACA. He then concluded that "[u]nder the circumstances of this case plaintiffs will be granted standing to challenge committee membership...." 557 F.Supp. at 527.

In reaching the merits of plaintiffs' claim, however, Judge Gesell's analysis is strikingly similar to the government's non-justiciability argument in the case now before the Court. First, Judge Gesell noted that nowhere in the FACA is the term "balanced" explained and that interpreted most broadly, it would take far more than 150 people to represent every viewpoint on the financial administration of federal programs. *Id.* at 528. He then focused on the function of the Executive Committee, noting that Congress had drafted the FACA to require balance in terms of "the functions to be performed by the advisory committee." He recognized that the function of the Executive Committee was very narrow and explicit: "to apply to federal programs the expertise of leaders in the private sector with 'special abilities to give detailed advice on cost-effective management of large organizations.'" *Id.* (quoting a House Press Release on the committee). Thus, he concluded that the "imbalances" alleged by plaintiffs were "irrelevant to the ability of the Executive Committee to perform its function fairly and impartially." *Id.* What Judge Gesell said next is illuminating:

> Plaintiffs have failed to demonstrate any imbalance in the Executive Committee within the meaning of the FACA. Thus it is unnecessary to confront plaintiffs' far-reaching suggestion that Congress contemplated that the courts should be placed in the role of reviewing the President's choice of advisors.

*Id.* at 528–29. This comment indicates Judge Gesell's recognition of the lack of any judicially manageable standards by which to review the balance of the committee's members. His further comments also suggest the nonjusticiability of the "fair

balance" requirement. In describing the FACA, he said:

> [T]he statute that resulted is another example of unimpressive legislative drafting. It is obscure, imprecise, and open to interpretations so broad that in the present context at least it would threaten to impinge unduly upon prerogatives preserved by the separation of powers doctrine. Not surprisingly, litigants seize on such uncertainties and may try to press statutory claims beyond constitutional boundaries. The courts do not welcome their role in such disputes. Many with considerable merit on their side criticize the involvement of federal courts in matters of this kind although the fault lies primarily with congressional drafting. If more expertise were applied to such enactments to ensure that Congress states with more precision what it intends, the rules of the game would be more sharply drawn and court involvement could be less.

> The present controversy is a good example of this phenomenon. The Act leaves a myriad of questions unanswered, especially concerning the extent to which Congress intended to interfere with the President's formulation of policy. A president constantly seeks, as he should, informed advice. His choice of advisors should be largely his personal concern under our tripartite form of government.

557 F.Supp. at 530.

On appeal, the circuit court affirmed Judge Gesell's decision. In an opinion written by Judge Edwards for Judges Wilkey and McGowan, the court noted that Judge Gesell's standing determination had relied heavily on *dicta* from *Physician's Education Network*. It then stated that "[t]he standing question is a close one that we need not resolve to decide this appeal, but we are inclined to agree with the District Court's conclusion." 711 F.2d at 1074. In a footnote, the circuit court elaborated:

---

ing in other cases brought under FACA. *Id.* The cases it cited, however, all involved § 10 challenges to the open access requirements of

the FACA, *not* to the "fair balance" requirements of § 5(b).

As the Government points out, the cases on which we relied in *Physician's Education Network* involved attempts to enforce rights conferred by § 10 of the Act; unlike § 10, the Government argues, § 5 confers no specific right on anyone, and a violation of the latter provision does not give rise to an injury-in-fact. In the Government's view, the appellants' claim of injury can rest only on the possibility of an ultimate diminution of federal food benefits, and "the asserted harm is speculative and conjectural *in the purest sense.*" *Metcalf v. National Petroleum Council,* 553 F.2d 176, 186 (D.C.Cir.1977) (emphasis in original) (footnote omitted). Although we express no view on whether this type of injury might confer standing if the Survey clearly had gone beyond its allegedly limited role and was recommending substantive cutbacks in federal feeding programs, we agree with the Government that, on the basis of the evidence before the District Court, this asserted injury would not confer standing.

Like the District Court, however, we can find "no distinction between requirements under § 5 and requirements under § 10 of the Act" for purposes of standing. 557 F.Supp. at 527. Section 5, to be sure, confers no cognizable personal right to an advisory committee appointment. But, the legislative history makes clear, the "fairly balanced" requirement was designed to ensure that persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee.... When the requirement is ignored, therefore, persons having a direct interest in the committee's purpose suffer injury-in-fact sufficient to confer standing to sue.

711 F.2d at 1074 n. 2 (citations to legislative history omitted).

Turning to the merits of the case, the circuit court concluded that "the District Court's conclusion that the Executive Committee's members represent a fair balance of viewpoints given the functions to be performed is unimpeachable." *Id.* at 1074.

The circuit court's affirmance did not spell the end for the *Nat'l Anti–Hunger Coalition* case. Barely a month after the circuit court rendered its decision, Judge Gesell issued an opinion on plaintiff's motion for relief from judgment on the grounds of new evidence. After the case had been dismissed but before the appeal was decided, the Executive Committee adopted recommendations for the repeal of existing legislation concerning specific benefits under the Food Stamp Program. The plaintiffs once again argued that the Executive Committee was not "fairly balanced" to make such recommendations, particularly in light of its expressed purpose. Judge Gesell agreed. He held that these recommendations were substantive in nature because they affected the established statutory rights of those then eligible for certain benefits such as food stamps. As such, they did not "fall within the narrow area of cost and management control," which the Executive Committee was created to address. 566 F.Supp. at 1517. Rather, the specific recommendations involved "areas of general national import," which "could not have been approved under the Act except by a committee 'fairly balanced' to represent the points of view affected, and this Committee was unbalanced as to these substantive legislative policy issues." *Id.* Judge Gesell then amended his original order to declare that the recommendations to repeal the three food stamp benefits had been developed and approved in violation of the FACA. The government did not appeal this decision.[5]

---

**5.** After the *Nat'l Anti–Hunger Coalition* trilogy of cases, two more "fair balance" cases were decided by the district court but were not appealed. In *Nat'l Treasury Employees Union v. Reagan, et al.,* No. 88–186, 1988 WL 21700 (D.D.C. Feb. 28, 1988), Judge Pratt denied plaintiff's motion for a preliminary injunction without resolving the question of standing. He noted in a footnote,

however, that he "ha[d] severe doubts concerning plaintiff's standing to bring this suit," particularly in light of the warning of the circuit court in the *Metcalf* case. Slip op. at 7, n. 5. In *Nat'l Assoc. of People with AIDS, et al. v. Reagan,* No. 87–2777 (D.D.C. Dec. 16, 1987), Judge Gasch similarly denied a motion for a preliminary injunction based on the "fair balance" require-

The most recent case out of this circuit regarding the "fair balance" requirement resulted in a per curiam decision and three separate written opinions. In *Public Citizen, et al. v. Nat'l Advisory Committee on Microbiological Criteria for Foods, et al.*, 886 F.2d 419 (D.C.Cir.1989), *aff'g* 708 F.Supp. 359 (D.D.C.1988) (Penn, J.), two judges on the panel, Judges Friedman and Silberman, voted to affirm the district court's dismissal of the case, but for different reasons. Judge Edwards voted to remand the case for further review on the merits.

*Microbiological Criteria* involved a challenge to the composition of the National Advisory Committee on Microbiological Criteria for Foods (the committee), established by the Secretary of Agriculture to provide advice and recommendations on the development of microbiological criteria for foods. Plaintiffs were Public Citizen, a senior citizen organization, and three consumer research, education, and advocacy organizations. Plaintiffs argued that although the purpose of the committee was "to provide advice on the types of biological contaminants that present the gravest risks to consumers, the kinds of foods on which USDA and HHS should focus their attention, and the nature of the regulatory scheme, if any, the federal government should devise to respond to the health threats posed by microorganisms," the committee lacked any consumer representative or advocate and thus was not "fairly balanced" within the meaning of § 5 of the FACA. 708 F.Supp. at 361. The committee, made up of 19 members, included two university professors, one state agriculture department official, one state agriculture department and consumer services official, two persons employed by food research firms, six persons employed by relevant federal agencies, six persons employed by private food companies, and one person employed by a food processors' organization. Plaintiffs sought a preliminary injunction preventing the committee from proceeding with its work unless it met the balance requirements of the FACA.

Although Judge Penn did not address the doctrines of nonjusticiability and standing specifically, he did hold that plaintiffs were not entitled to a preliminary injunction because they had failed to demonstrate a likelihood of success on the merits or irreparable injury. The court determined that, reviewing the member's viewpoints in terms of the function to be performed, the plaintiffs had offered no evidence that the committee was unfit for its assigned purpose. Although Judge Penn examined the makeup of the committee, thus preliminarily reaching the merits of plaintiffs' claims, his parting comments sound of nonjusticiability and lack of standing:

> This case illustrates several aspects of the difficulty of applying objective legal rules to the FACA. For example, plaintiffs rely solely on inferences and speculation to taint the composition of the Committee, thus food industry employment is equated with anti-regulatory sentiments and any member who has ever worked as a consultant for industry is also classified in this manner. Notably, plaintiffs have offered no specific evidence that their viewpoints are not adequately represented by the Committee. Like other courts which have addressed similar issues, *this Court is concerned that if the speculative and conjectural injuries offered by the plaintiffs in this case were judicially cognizable, the Court would then be called upon to supervise the membership of federal advisory committees on a continual basis, thereby altering the composition of these committees on a subjective determination of fair balance.*

708 F.Supp. at 364 (citations omitted) (emphasis added). Judge Penn not only denied the preliminary injunction; he also dismissed the case.

On appeal, Judge Friedman's [6] opinion affirmed Judge Penn on the merits without addressing justiciability or standing. He

---

ment of the FACA. Although he did not address standing, he did base his decision in part on plaintiffs' failure to show irreparable injury, noting the speculative nature of their injury.

6. Sitting by designation from the Federal Circuit.

did, however, state that "[t]he determination of how the 'fairly balanced' membership of an advisory committee, in terms of the points of view represented and the functions the committee is to perform, is to be achieved, necessarily lies largely within the discretion of the official who appoints the committee." 886 F.2d at 424. Thus, according to Judge Friedman, the appropriate standard of review on the merits is the abuse of discretion standard.

Judge Silberman's opinion never reaches the merits of plaintiffs' claim. He concluded that the district court lacked jurisdiction because the question presented was not justiciable under the Administrative Procedure Act (APA) or the Constitution and because the plaintiffs lacked standing.

With respect to justiciability, Judge Silberman noted that to be justiciable under the APA, the court "must first conclude that Congress provided 'a meaningful standard against which to judge the agency's exercise of discretion.'" 886 F.2d at 436 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985)). When no such meaningful standard exists, "the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely," precluding judicial review. *Id.* Because he could not discern any meaningful standard by which to review whether an advisory committee is "fairly balanced in terms of the points of view represented and the functions to be performed," Judge Silberman concluded that judicial review was unavailable:

The relevant points of view on issues to be considered by an advisory committee are virtually infinite and, therefore, the judgment as to what constitutes an appropriate or "fair" balance of those views must be a political one. This kind of a decision is very similar to the one a chairman of a congressional committee must make when he or she determines which witnesses should be called to testify about proposed legislation. Thus, even before the points of view on an advisory committee can be balanced at all—"fairly" or otherwise—it must first be determined *which* points of view

should be balanced. And I can conceive of no principled basis for a federal court to determine which among the myriad points of view deserve representation on particular advisory committees.

886 F.2d at 426 (emphasis in original). In response to plaintiffs' argument that at least those with a "direct interest" should be represented, Judge Silberman concluded that "direct interest" was no more definable than "fairly balanced":

In the first place, the line between those with "direct interests" and those with indirect or tangential ones is hopelessly manipulable. The courts would be obliged to make an arbitrary decision as to how attenuated an interest must be before it should be classified as "indirect." ...

Even if we could decide which groups or individuals possessed such a direct interest, we would be forced to engage in the utterly nonjudicial task of determining whether that interest enjoyed "some" representation on the committee.... Is a court then to decide whether a committee included "some" representation of a given person or group by crudely dividing committee members into political, social, or economic status groups and then comparing the appointments with the status groups of those seeking representation? ...

*Id.* at 427. Judge Silberman specifically rejected plaintiffs' argument that *Nat'l Anti–Hunger Coalition* governed the issue. Acknowledging the circuit's suggestion in that case that exclusion of those with a direct interest might cause injury in fact, Judge Silberman pointed out that the suggestion was merely *dicta* and that the court had specifically declined to resolve the standing question and had not even discussed justiciability. As such, Judge Silberman stated that *"National Anti–Hunger* is hardly precedent on these questions." *Id.* at 428.

Having concluded that plaintiffs' claim under the FACA was nonjusticiable, Judge Silberman went on to hold that plaintiffs also lacked standing to sue:

For the very reason that this case is nonjusticiable, appellants lack standing to sue. Their injury, even assuming it exists, is not redressable unless the court takes a series of leaps long enough to try the faith of any believer. A court attempting to fashion a decree to vindicate appellants' claim would be forced, either overtly or impliedly, to make the same arbitrary policy judgments described above.... Judge Edwards' suggestion that redressability is not a problem because the court may simply enjoin the operation of the committee until adequate consumer representation is appointed begs the essential question in my view, since he does not explain how "consumer representative" would be defined.... The difficulty in redressing the appellants' alleged injury is analytically identical to adjudicating their claim in the first instance, a task, as I have indicated, that I think a court cannot perform.

886 F.2d at 431.

Judge Edwards' opinion in *Microbiological Criteria* was a stark contrast to Judge Silberman's opinion. Judge Edwards concluded that plaintiffs' claim was justiciable and that plaintiffs had standing. He therefore voted to remand the case to the district court for further consideration. With regard to justiciability, Judge Edwards concluded that the "fair balance" requirement was enacted "to constrain executive discretion and to establish a measurable standard against which to judge executive action." 886 F.2d at 433. Judge Edwards reasoned that, based on the legislative history of the "fair balance" requirement and the number of claims that had been pursued in the district court, "[t]he question of justiciability of claims under section 5 of FACA is thus not an open issue in this circuit." *Id.*

With respect to standing, Judge Edwards declined to discuss the requirement that plaintiffs suffer an injury fairly traceable to the challenged action. Instead, he focused only on redressability, stating that "[t]he alleged injury from the lack of *any* consumer representative is easily remedied by the relief requested by Public Citizen— an injunction suspending operation of the

Committee until consumers are represented on it." 886 F.2d at 434. As Judge Silberman pointed out, Judge Edwards declined to comment on how a "consumer representative" would be selected and whether the court should be called upon to continually review the composition of the committee each time it considers a new issue that affects a new interest group.

## B. Applying the Case Law

Although there is no dispute over the facts of this case, there is great dispute over the controlling law. Plaintiffs argue that *Nat'l Anti–Hunger Coalition* and the cases that have followed it establish that the "fair balance" requirement of the FACA is justiciable and that individuals and groups with a "direct interest" in the committee's work have standing to sue for violations of that requirement. The government argues that none of the cases establish binding precedent on either issue. The Court agrees with the government.

### 1. *Nonjusticiability*

■ Section 10(a)(2) of the APA bars judicial review of agency action when the action is "committed to agency discretion by law." Under *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), agency action is committed to agency discretion by law when Congress has provided no "meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 830, 105 S.Ct. at 1655.

■ In the case now before the Court, there are no meaningful standards by which the Court can review whether the FDA Advisory Committee is "fairly balanced in terms of the points of view represented and the functions to be performed." The Committee's purpose is to examine "the mission, responsibilities and structure of the FDA according to its legislative mandate and to make recommendations on how the Agency can be strengthened to fulfill its mission." Charter of the FDA Advisory Committee. This is a broad purpose for which there is no doubt a broad range of viewpoints. For the Court to

become entangled in determining which viewpoints must be represented is for the Court to arbitrarily substitute its judgment for that of the agency. No meaningful standards are available to assist the Court in making such political and ideological determinations.

Plaintiffs seem to agree that there are no meaningful standards to review the composition of the Committee with respect to its broad mandate. They claim, however, that the preemption recommendation exceeds this mandate because the Committee is not "fairly balanced" to consider recommendations that impinge on states' rights. They claim that there are meaningful standards for the Court to use, as set forth in Judge Gesell's opinion in *Nat'l Anti–Hunger Coalition* regarding the "function" of the committee. 557 F.Supp. at 528. They also argue that standards can be found in Executive Order No. 12,612 (October 26, 1987), which requires that states be consulted in the formulation of policies that have a preemptive effect. Moreover, they argue that standards can be found in recommendations of the Administrative Conference of the United States that states be included in decisionmaking regarding preemption. *See* 1 C.F.R. § 305.84–5, Recommendations 3 and 4.

To the extent that *Nat'l Anti–Hunger Coalition* suggested a "function-based" standard of review, the Court finds little guidance from this standard.[7] Is the Court to engage in continuous oversight so that for each separate "function" that a particular committee engages in, the Court can reassess whether the committee was "fairly balanced" to engage in that function? Is the Court to examine the background of every person on the committee to determine whether anyone already represents the interests of the person or group challenging the committee's composition? If, as plaintiffs suggest in this case, the only appropriate representative of states' interests is someone currently affiliated with, and answerable to, a state, then who is to determine which of the 50 states that per-

son is to come from? If, as plaintiffs suggest, the decision is left to the Secretary, then how will the Court review the Secretary's decision if the plaintiff later complains that the person chosen has a different viewpoint than someone from a different state? Surely not all states are in agreement regarding federal preemption of matters within the FDA's jurisdiction. The possibilities, as Judge Silberman pointed out in *Microbiological Criteria,* are "virtually infinite," and the judgment regarding what constitutes a fair balance of views "must be a political one." 886 F.2d at 426.

With respect to the Executive Order that plaintiffs refer to as establishing a judicial standard for review, the Order specifically states that it does not confer a private right of action. Moreover, the preference for state involvement in preemption decisions, as expressed in the Executive Order and the Administrative Conference recommendations, is not violated by the FDA Advisory Committee making a preemption recommendation. Its recommendation is simply that: a recommendation. There is still ample time for Congress and the Secretary of HHS to consult with representatives of states' interests before taking any action regarding preemption. Without a doubt, both will engage in extensive debate on the issue and will most certainly hear from the states as well as from consumer groups. That is the essence of the political process. To the extent that plaintiffs fear that the recommendation of the "blue chip" FDA Advisory Committee will cause preemption legislation to sail its way through Congress without question or debate, plaintiffs ignore the reality of political action in the 20th Century. Plaintiffs, virtually all of whom are well-versed political organizations, do not need this Court's assistance to convince Congress that the FDA Advisory Committee lacks a state perspective. Nor are they entitled to court intervention in what amounts to no more than a generalized grievance that any member of the public could make. To engage in such judicial oversight would be to ignore the separation of powers that remains the funda-

7. Although Judge Gesell reached the merits in the *Nat'l Anti–Hunger Coalition* case, many of his comments, which the Court has quoted *supra,* ring of a nonjusticiability analysis.

mental tenet of our democratic system. Therefore, because there are no judicially manageable standards for the review of the "fair balance" requirement, this Court must grant defendant's motion and dismiss this case.

### 2. *Standing*

 Although the Court's ruling that this action is nonjusticiable is dispositive of this case, the Court will briefly address standing as an alternative ground for its decision. There are three requirements a plaintiff must show to have standing: 1) a distinct and palpable injury; 2) an injury "fairly traceable" to the challenged action; and (3) an injury likely to be redressed by the requested relief. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Not surprisingly, plaintiffs argue that the footnote in *Nat'l Anti–Hunger Coalition,* as well as the discussions in subsequent cases, establish that those individuals or groups with a "direct interest" in the work of an advisory committee have standing to sue if their interests are not represented. They argue that this view of the law was apparently accepted by the district courts in *Nat'l Treasury Employees Union v. Reagan, et al.,* No. 88–186, 1988 WL 21700 (D.D.C. Feb. 28, 1988) (the *NTEU* case), *Nat'l Assoc. of People with AIDS, et al. v. Reagan,* No. 87–2777 (D.D.C. Dec. 16, 1987) (the *AIDS* case), and in the *Microbiological Criteria* case, because none of these cases were dismissed for lack of standing. They argue that no one could have a more direct interest in preemption than the state of California, thus, the state has standing to bring this lawsuit.

As an initial matter, the *NTEU* and the *AIDS* cases were decided on motions for preliminary injunctions, from which no appeal was taken. The standard of review at that level is quite different from the standard on the merits. The expedited track on which those cases progressed did not allow time for a detailed analysis of justiciability or standing. Nor did the well-known four-factor standard of review take into account such an inquiry. *See Washington Metropolitan Area Transit Commission v. Holiday Tours,* 559 F.2d 841, 843 (D.C.Cir. 1977). Thus, the mere fact that the courts in those cases addressed the likelihood of success on the merits can not be taken as an indication that the law in this area is well-settled.

 For the reasons set forth in *Physician's Education Network* and by Judge Silberman in *Microbiological Criteria,* this Court holds that plaintiffs lack standing to sue. In *Physician's Education Network,* the facts were strikingly similar to those now before the Court. In that case, as in this case, the challenge came after the advisory committee made a specific recommendation that the plaintiffs were unhappy with. Despite this, Judge Pratt held, and the circuit court affirmed, that there was no standing. Although Judge Pratt suggested there was no injury in fact, he did not have to decide the question because it was clear that any relief granted would not redress the injury alleged. The same was said by Judge Silberman in *Microbiological Criteria* and the same is true in this case.

If, as plaintiffs' claim, the state of California's "direct interest" in not having its consumer laws preempted is sufficient to establish injury in fact, there is still no basis to argue that a repeal of that recommendation would redress plaintiffs' alleged injury. This case was filed 10 months after the FDA Advisory Committee recommended that Congress pass legislation preempting state law in areas within the FDA's jurisdiction. By then, the seeds of the idea of preemption had already been planted in the minds of those who reviewed the recommendations. To repeal the recommendation now would be inconsequential. To the extent plaintiffs seek to send a "message" to Congress that the committee is unbalanced, they do not need the Court to do their lobbying for them. Congress is astute enough to make its own determination about whether the fair balance requirement has been met. Therefore, because the relief plaintiff seeks cannot redress the harm plaintiffs complain of, the Court must also dismiss this case for lack of standing.

## CONCLUSION

Having carefully reviewed the case law in this circuit, the Court has found no binding precedent governing justiciability or standing as it relates to challenges brought under the "fair balance" requirement of the FACA. Because of the posture of most of the cases that have reached the appellate level, the circuit has found it unnecessary to conclusively rule on these issues. Perhaps this case will provide the circuit with an opportunity to finally resolve them.

For all of the foregoing reasons, this Court shall grant defendant's motion and dismiss this case on the grounds of nonjusticiability and lack of standing.

## APPENDIX

The Committee currently consists of the following members:

—Rita R. Colwell, Ph.D., Director, Maryland Biotechnology Institute, College Park, MD;

—Jane L. Delgado, Ph.D., President and Chief Executive Officer, National Coalition of Hispanic Health and Human Services Organizations (COSSMHO), Washington, D.C.;

—Charles C. Edwards, M.D., Chairman of the Advisory Committee and President and Chief Executive Officer of the Scripps Clinic and Research Foundation in La Jolla, CA;

—Sherwin Gardner, Vice President for Science and Technology, Grocery Manufacturers of America, Inc., Washington, D.C.;

—James D. Grant, Chairman and Chief Executive Officer, T Cell Sciences, Inc., Cambridge, MA;

—Lawrence C. Horowitz, M.D., Investment Banker, James D. Wolfensohn, Inc., Menlo Park, CA;

—Louis Lasagna, M.D., Dean, Sackler School of Graduate Biomedical Sciences, Tufts University, Medford, MA;

—Richard A. Merrill, Albert C. Tate, Jr. Research Professor of Law, University of Virginia School of Law, Charlottesville, VA;

—Alan R. Nelson, M.D., Immediate Past President, American Medical Association, Chicago, IL;

—Milan Puskar, President, Mylan Pharmaceuticals Inc., Morgantown, WV;

—John Rother, Director of Legislation, Research and Public Policy Division, American Association of Retired Persons, Washington, D.C.;

—Frank E. Samuel, Jr., former President, Health Industry Manufacturers Association, Washington, D.C. and currently a consultant to the health care and medical device industries;

—John G. Smale, former President and Chief Executive Officer, Procter and Gamble, Cincinnati, OH, and currently Chairman of the Executive Committee of its board;

—John M. Taylor, Consultant, Patton, Boggs, and Blow, Washington, D.C., and former Associate Commissioner for Regulatory Affairs of FDA;

—Joseph D. Williams, Chairman and Chief Executive Officer, Warner–Lambert Company, Morris Plains, NJ.