Mary DOE, Preborn Child in
Being, et al., Plaintiffs

v.

Donna SHALALA, et al., Defendants.

Civ. No. PJM 94–1703.

United States District Court,
D. Maryland,
Baltimore Division.

Sept. 26, 1994.

(NIH) Human Embryo Research Panel (Panel) on the grounds that the membership of the Panel is not "fairly balanced" within the meaning of the Federal Advisory Committee Act (FACA), 5 U.S.C., App. 2, § 5(b)(2) and on the further grounds that Section 101 of the NIH Revitalization Act of 1993 (Revitalization Act), 42 U.S.C. § 289a–1, violates the U.S. Constitution. More immediately, their objective is to prevent the Panel from holding any meetings or making any recommendations to NIH or the Secretary of Health and Human Services with regard to the issue of human fetal research. The matter comes before the Court in the form of a Motion for Preliminary Injunction, anticipating the imminent publication by the Panel of its report and recommendations.

The Court holds that Plaintiffs lack standing to litigate these claims and, particularly insofar as the claims are based on the Federal Advisory Committee Act, that the matter is non-justiciable. Accordingly, the Court finds no need to engage in the usual preliminary injunction analysis and will proceed directly to dismiss Plaintiffs' suit.[1]

## II.

Would-be Plaintiff Mary Doe is an unnamed baby girl who, according to the Amended Complaint, is "a pre-born child in being as a human embryo." She is allegedly one of more than 20,000 such embryos *ex utero* located in various in vitro laboratories within the United States. Plaintiff International Foundation for Genetic Research (The Michael Fund) is a non-profit organization whose primary purpose is to sponsor research involving the genetic disorder known as Down's Syndrome and similar inborn chromosomal disorders. Plaintiff Michael

R. Martin Palmer, Jr., Hagerstown, MD, for plaintiffs.

Margaret H. Plank, U.S. Department of Justice, Civ. Div., Washington, DC, for defendants.

## OPINION

MESSITTE, District Judge.

## I.

Plaintiffs in this suit seek to enjoin the activity of the National Institutes of Health

---

1. The Court understands that Plaintiffs at this juncture seek only preliminary injunctive relief. Defendants, however, have filed a Motion for Judgment on the Pleadings or, in the Alternative for Summary Judgment, as to which Plaintiffs have filed an opposition. The issue of standing is, therefore, joined as to all aspects of the case. Moreover, standing necessarily inheres as a threshold issue whenever a party seeks relief in court, including preliminary injunctive relief.

The Court has thus had to decide this issue without delay. Inasmuch as Plaintiffs have been held to lack standing for purposes of entitlement to preliminary relief, it is clear that they also lack standing to pursue any further relief in the case; hence the Court's dismissal of the suit.

Given the Court's decision of the standing issue, it becomes unnecessary to address, one by one, the conventional considerations for the issuance of a preliminary injunction.

Policastro, after whom The Michael Fund was named, is 24 years of age and suffers from Down's Syndrome. Defendants, in addition to the Secretary of U.S. Department of Health and Human Services and NIH, are the Department of Health and Human Services, the Director of NIH individually, the NIH Human Embryo Research Panel and the individual members of the Panel.

The Panel whose activities are challenged in this proceeding came into existence following the enactment of the NIH Revitalization Act of 1993, P.L. No. 103–43, codified at 42 U.S.C. § 281 et seq. Consideration of pertinent provisions of the Act will illuminate the nature of the litigation.

Under the Act, the Secretary of HHS may not withhold federal funds for clinical research "because of ethical considerations" unless she first convenes an ethics advisory board (EAB) which, in accordance with certain prescribed procedures, studies such considerations, and either (1) recommends, by majority vote, because of ethical considerations, that the Secretary withhold funds for their proposed research or (2) recommends, by majority vote, because of ethical considerations, that the Secretary *not* withhold funds for the proposed research, but the Secretary finds the recommendation to be arbitrary and capricious. *See* 42 U.S.C. § 289a–1(b). This law amended existing federal regulations governing research on human embryos, which required such research to be reviewed by an EAB before such research might proceed. *See* 45 C.F.R. § 46.204(d). Because prior presidential administrations apparently chose not to appoint an EAB, no funding for such research had in fact been approved. What the new law did was to reverse the conditions for in vitro fertilization research: it could go forward unless disapproved. Previously it could not go forward unless approved.

Nothing in the new law appears to require the Secretary of HHS to appoint an EAB.[2]

The law merely sets forth the procedures the Secretary must follow if and when she chooses to convene an EAB: Under the Act, she must first publish a statement in the *Federal Register* announcing her intention to convene the board, which must include a request that interested individuals submit recommendations "specifying the particular individuals who should be appointed to the advisory board involved." The Secretary must then consider these recommendations in making appointments to the EAB. *See* 42 U.S.C. § 289a–1(b)(4)(A) and (B). The EAB must be composed of no fewer than 14 nor more than 20 members "who are not officers or employees of the United States" and who are "individuals with special qualifications and competence to provide advice and recommendations regarding ethical matters in biomedical and behavioral research." It must also be composed of at least one attorney, one ethicist, one practicing physician, one theologian, and no fewer than ⅓ but no more than ½, of "scientists with substantial accomplishments in biomedical or behavioral research." 42 U.S.C. § 289a–1(b)(5)(C). An appointed member serves "for the life of the board" and can only be removed by the Secretary "for neglect of duty or malfeasance or for other good cause shown." 42 U.S.C. § 289a–1(b)(5)(D) and (E).

Not later than 180 days after an EAB is convened, it is required to submit to the Secretary and to the Committee on Energy and Commerce of the House of Representatives and the Committee on Labor and Human Resources of the United States Senate a report describing its findings regarding the proposed research project or projects and making recommendations as to whether the Secretary should or should not withhold funds for such project or projects on ethical grounds. 42 U.S.C. § 289a–1(b)(5)(B)(ii).

With the passage of the Revitalization Act, NIH in fact received a number of applica-

---

2. *See* 1993 Acts, Senate Report No. 103–2 in 1993 U.S.Code Cong. and Adm.News, p. 196, 215:

The committee further recognizes that there may be, from time to time, particular research proposals for which ethical considerations have not been addressed to the Secretary's satisfaction by

the institutional review boards and NIH's merit review system. For those cases, the committee provides a mechanism of convening ethics advisory panels to more fully address the Secretary's concerns. The committee has left to the Secretary the appointment of panel members, within certain guidelines.

tions seeking financial support of research involving human embryos. During the fall of 1993, therefore, Secretary Shalala, acting pursuant to the law, decided to convene and appoint an EAB, to be known as the NIH Human Embryo Research Panel.[3] The Panel was charged by the Secretary with addressing the moral and ethical issues raised by the use of human embryos in research and with developing "guidelines" as to which areas of research involving human embryos would be acceptable for funding, which would require additional review, and which would be unacceptable for federal support. The Committee has held five public meetings all of which were open to the public and is expected to render a report to the Advisory Committee to the Director of NIH in short order.

In the present suit Plaintiffs seek to block issuance of the report and any further activities of the Panel, contending in part that at least 10 of the 19 members of the Panel "are current or former NIH grantees who have firmly endorsed the principle and many of the protocols of extended and unfettered human embryo research." The Panel, say Plaintiffs, "is accordingly predisposed to and will most probably make recommendations in favor of the Secretary not withholding federal funding for at least some projects involving human embryo research."

If, Plaintiffs continue, the Panel makes recommendations in favor of the Secretary not withholding federal funding for proposed projects involving human research, Plaintiffs will be harmed in the following ways: would-be Plaintiff Mary Doe and the group of which she is a part will be deprived of "the right to life without due process of law"; Plaintiff The Michael Fund will have federal funding otherwise available to support research involving Down's Syndrome and related disorders diverted to projects involving human embryo research; and individual Plaintiff Michael Policastro will not only suffer the consequences of the Fund's reduced research support, but will, along with other mature persons affected with Down's Syndrome, be threatened with the loss of life by the activities of Defendants, "which will have the effect of making socially acceptable, and ultimately fully legal, the destruction of people affected with Down's Syndrome."

Plaintiffs challenge the existence and activities of the Panel in several counts. They contend:

—in Count I, that the lack of balance and conflicts of interest prevalent on the Panel violate the "fair balance" requirement of the Federal Advisory Committee Act, 5 U.S.C., App. 2, Section 5(b)(2);

—in Count II, that Section 101 of the Revitalization Act violates Article II, Section 2, Clause 2, the Appointments Clause of the U.S. Constitution, which requires Presidential appointments of certain government officers;

—in Count III, that Section 101 of the Act violates Article II, Section 3 of the Constitution in that it restricts the President's power to take care that the laws be faithfully executed;

—in Count IV, that Section 101 violates the doctrine of separation of powers; and

—in Count V, that the actions of Defendants violate the Fifth, Eighth, and Ninth Amendments to the Constitution, in that they will deprive would-be Plaintiff Mary Doe, others like her, and individual Plaintiff Michael Policastro, of life and liberty without due process of law, subject them to cruel and unusual punishment, and deprive them of their right to privacy.

Mindful of the imminent publication by the Panel of its report and recommendations to the Advisory Committee and the Secretary, Plaintiffs ask for a preliminary injunction to prevent the publication as well as a cessation of any further Panel activities pending trial.

In response, the United States argues primarily that the Panel is not an "advisory committee" subject to the Federal Advisory Committee Act, but only a group of consultants which will advise the Standing Advisory Committee of NIH, which in turn will advise

---

**3.** The Government disputes that the Panel is either an "advisory committee" under FACA or an EAB under the Revitalization Act. The Court assumes for purposes of this Motion that the Panel is both.

the NIH Director. The Government also argues that Plaintiffs lack standing to pursue this suit and that certain issues are either non-justiciable or not ripe for decision. The Government opposes the issuance of a preliminary injunction.

The Court finds that considerations of standing and justiciability are dispositive of the case. The Court therefore considers the applicable legal concepts.

## III.

■ A) The Court accepts that organizational Plaintiff The Michael Fund and individual Plaintiff Michael Policastro properly speak for themselves through designated counsel. The situation is considerably different, however, as to would-be Plaintiff Mary Doe, described as a "pre-born child in being as a human embryo." Putting aside for the moment the question of whether a human embryo has independent legal interests capable of protection, it is clear that any such interests would have to be protected through the person of a *guardian ad litem*. See Fed.R.Civ.P. 17(c); Cf. *Hatch v. Riggs National Bank*, 361 F.2d 559 (D.C.Cir.1966) (proper to appoint guardian ad litem for unborn beneficiaries of trust). Indeed The Michael Fund has filed a motion that someone, presumably it, be appointed *guardian ad litem* of Mary Doe.

Ordinarily the inquiry with regard to appointment of a *guardian ad litem* would be limited to whether the guardian can adequately represent the interests of its ward. *Cf.* 42 Am.Jur.2d Infants, § 179. Here, however, the matter is complicated by the fact that Mary Doe seeks to represent not only herself, but "all others similarly situated," which the Court understands to be some 20,000 human embryos currently in storage in various facilities around the United States. In other words, although The Michael Fund does not pray or plead it as such, it seeks to have this action proceed as a class action pursuant to Fed.R.Civ.P. 23.

There are several reasons why the suit cannot proceed as to "Mary Doe." First, philosophical and religious considerations aside, the Supreme Court has made it clear that the word "person," as used in the Fourteenth Amendment, does not include the unborn. *Roe v. Wade*, 410 U.S. 113, 158, 93 S.Ct. 705, 729, 35 L.Ed.2d 147 (1973). It has thus been held that embryos are not persons with legally protectable interests within the meaning of Fed.R.Civ.P. 17(c) such that appointments of *guardians ad litem* are warranted or required. *See Roe v. Casey*, 464 F.Supp. 483 (E.D.Pa.1978), *aff'd* 623 F.2d 829 (3d Cir.1980). The Court sees no distinction between fetuses *in utero* or *ex utero*.

Additionally, appointing a *guardian ad litem* for an unspecified embryo, much less for a class of some 20,000, would present the Court with an impossible task. While the Court in no sense questions the bona fides of The Michael Fund, it is asked to decide that The Michael Fund, which is apparently committed to the prevention of federal funding for fetal research, can fairly represent the interests of one unspecified fetus and 20,000 others. The Senate and House Reports on the Revitalization Bill, however, demonstrate that there is considerable sentiment—indeed a majority of both Houses of Congress— which directly opposes the position of The Michael Fund and which holds a distinctly different view regarding the benefits of human fetal research.[4]

4. *See* 1993 Acts, Senate Report No. 103–2 in 1993 U.S.Cong. and Admin.News, p. 196, 209–210:

Scientists have been using fetal tissue for disease research since the 1950's. Fetal cells have been especially useful for the reproduction of human viruses to test drugs and vaccines. For example, cultured human fetal kidney cells were essential to growing the polio virus and the research that led to the development of the polio vaccine. Forty years ago, more than 50,000 people were afflicted with paralytic polio each year. Today,

as a direct result of that research people throughout the world need not suffer from that disease.

\* \* \* \* \* \*

Clinical transplantation of fetal tissue is at the earliest stage of development. The purpose of the research is to determine if therapy with fetal tissue holds promise for the development of new treatments or cures for disease. Although the moratorium has thwarted research to answer this question, there is some preliminary evidence that indicates the potential for fetal tissue transplantation research. For example, fetal pancreatic tissue can make insulin for the treatment

Based on conventional considerations relating to the appointment of *guardians ad litem* and class representatives, the Court declines to designate the organizational Plaintiff as *guardian ad litem* for would-be Plaintiff Mary Doe. The suit will not be permitted to go forward and will be dismissed as to her. The Court proceeds with its review of the standing of Plaintiffs The Michael Fund and Michael Policastro to pursue the litigation.

### IV.

■ A) Under Article III, Section 2, of the U.S. Constitution, the judicial power of the United States extends to cases and controversies. The two terms, which are essentially interchangeable, *see Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937), refer to disputes which are "definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of affairs." *Id.*, 300 U.S. at 240–241, 57 S.Ct. at 464.

One component of the case or controversy requirement is the question of standing, which bears on the power of a court to entertain a party's claim. *See Valley Forge Christian College v. Americans United*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Standing involves determining whether a particular litigant is entitled to invoke the jurisdiction of a court to decide a particular issue. *Id.* The focus is on the status of the party seeking to pursue the complaint; the party's arguments on the merits of the case are irrelevant to the determination. *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).

■ Although there has been some uncertainty about the scope of the standing doctrine in the past, it is essentially settled that:

at an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision." [Citations omitted]

*Valley Forge Christian College*, 454 U.S. at 472, 102 S.Ct. at 758. The Court considers each of these elements.

■ With regard to the injury requirement, a party must have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 702, 7 L.Ed.2d 663 (1962). The injury must be direct, distinct and palpable, not merely conjectural. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). It must be an "injury-in-fact." *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 152 (1970). Mere interest in a problem, no matter how long-standing or how qualified the litigant, will not satisfy the requirement. *McKinney v. U.S. Department of Treasury*, 799 F.2d 1544 (Fed.Cir.1986). Nor will it do to allege injury to others which a plaintiff purports to represent. *U.S. Dept. of Labor v. Triplett*, 494 U.S. 715, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990). Nor, finally, is it sufficient to argue that, if Plaintiff is not given standing, no one will be able to litigate an issue. *Valley Forge Christian College*, 454 U.S. at 489, 102 S.Ct. at 767–68.

■ In addition to particularized injury, a plaintiff to have standing must also show that

of diabetes and can become integrated in the control of the body's energy metabolism. Similarly, fetal brain tissue can produce the chemical messenger dopamine, which is lacking in Parkinson's disease.

\* \* \* \* \* \*

This legislation ... establishes rational and fair procedures to address ethical concerns with sci-

entifically approved research projects. The measure is intended to prohibit unilateral actions that block research approved by the merit review system.

*See also* House Conf.Rep. No. 103–100, *Id.* at 287–288.

the injury concretely and demonstrably has resulted from defendant's action. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). In other words, in addition to injury-in-fact there must be causation-in-fact. The injury must be suffered "as a consequence of the alleged constitutional error," and must be "other than the psychological consequence presumably produced by observation of conduct with which one disagrees." *Valley Forge Christian College*, 454 U.S. at 482, 102 S.Ct. at 765. An assertion of harm that is too speculative or remote will not suffice. *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

At the constitutional level, there is yet a third requirement for standing, *i.e.* that the injury is likely to be redressed by a favorable decision. *See Simon*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). As the Supreme Court has instructed, there must be a "substantial likelihood" that the relief sought from the court, if granted, will remedy the harm. *See Duke Power Company v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981).

■ B) Along with the Article III core constitutional standing requirements, certain "prudential" limitations exist with regard to the exercise of jurisdiction by a federal court. That is, principles of prudence may counsel the judiciary to refuse to adjudicate some claims, even when constitutional standing has been satisfied. *See Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). The Supreme Court in *Valley Forge Christian College*, 454 U.S. at 474–475, 102 S.Ct. at 759–60 identified three considerations as prudential ones:

1) A plaintiff's interest must come within the "zone of interest" arguably protected by the statute in question. *See Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970);

2) A plaintiff may not air "generalized grievances" shared by all or a large class of citizens. *See United States v. Richardson*,

418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); and

3) A plaintiff ordinarily may not assert the legal rights of others, unless the party has suffered an injury in fact, has a close relation to the third party, and there is some hindrance to the third party's ability to protect his or her own interest. *See Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

C) Against this legal background, the Court considers Plaintiffs' claims in the present case.

■ The Court turns first to the issue of constitutional standing and the questions of injury-in-fact, causation-in-fact, and the redressability of any injury by a favorable court decision.

Plaintiffs The Michael Fund and Michael Policastro allege that injury to them will result because "federal funds available for the support of research designed to discover a cure and treatment for persons afflicted with genetic disorders, such as Down's Syndrome, will be reduced in direct proportion to the extent that such funds are diverted to the support of human embryo research projects." Michael Policastro is said to be threatened with the loss of his life because the activities of Defendants "will have the effect of making socially acceptable, and ultimately fully legal, the destruction of people with Down's Syndrome."

These allegations of injury, sincerely felt though they may be, do not, in the Court's view, pass constitutional muster. Such injuries are remote and speculative, not immediate and palpable. Even if, following a report of the Panel, NIH were to elect to fund fetal research projects (and it is by no means certain to what extent it will), there is no basis for concluding that that decision would diminish funding for research projects involving Down's Syndrome or other genetic disorders. Nor is there any basis in the least for suggesting that Plaintiff Michael Policastro's life might be at risk if fetal research were to go forward.

Similarly, Plaintiffs cannot satisfy the second constitutional requirement for stand-

ing—that there be causation between the challenged action and the particularized injury sustained. There is, again, simply no basis for concluding that an ultimate decision by NIH to fund fetal research would concretely and demonstrably diminish the organizational Plaintiff's funding or put Michael Policastro's life in danger.

Finally, it is open to serious question whether a court decree in this case would actually redress the alleged harm. What Plaintiffs ask for is injunctive relief to prevent the Human Embryo Research Panel from reporting to the Advisory Committee and the Secretary about the ethics of pursuing human embryo research or, indeed, from carrying on any further activities. But preventing the Panel from issuing a report could well have no effect whatsoever on the ultimate decision of the Secretary to fund such research. The Revitalization Act allows that such research may go forward *unless* an EAB advises the Secretary that it should not and if she does not overrule the Panel. In sharp contrast to prior law, there is no requirement that an EAB be constituted at all before the research proceeds. In other words, it may be doubted—for constitutional purposes—whether blocking the Panel's report or its other activity would fairly redress the harms claimed here if the Secretary of HHS decided to go forward with funding in the absence of a report from EAB and with the activities of the Board frozen by injunction. *See Public Citizen v. Dept. of Health and Human Services,* 795 F.Supp. 1212 (D.C.D.C.1992) (relief sought by plaintiffs in striking recommendations of "unbalanced" FACA committee held unlikely to redress plaintiff's claimed injury).

The Court concludes that Plaintiffs fail to meet the requisite constitutional requirements for standing to pursue this case.

■ D) Plaintiffs also fail to satisfy the prudential considerations of standing. They have sustained no injury within the "zone of interest" created by the executive order setting up the Panel; they are in fact airing generalized grievances of interest to citizens as a whole; and they are not able to assert the constitutional rights of others. In particular as to this last, as the Court has already

noted, the Supreme Court has clearly foreclosed any legal conclusion that human embryos are "persons" with constitutional rights to be protected. Beyond that, there has been no injury-in-fact to Plaintiffs, nor is there any sense in which Plaintiffs stand in a closer relationship to the putative third parties, *i.e.* human embryos, than any other citizen might.

The Court is ultimately guided by the overriding policy of prudential limitations: that the judiciary should seek to avoid deciding questions of broad social import where no individual rights would be vindicated. *See Gladstone, Realtors v. Bellwood,* 441 U.S. at 99, 99 S.Ct. at 1607–08. The issue of fetal research is undoubtedly one of the broadest social importance. But prudential limitations are "founded in concern about the proper— and properly limited—role of the Courts in a democratic society." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Plaintiffs present no concrete injuries particular to themselves which can be addressed in this suit. A federal court has no role to play in the resolution of the questions Plaintiffs seek to have decided.

### V.

With regard to Count I of the Amended Complaint, there is a further reason besides lack of standing why this case cannot proceed. In the Court's view, the matter is nonjusticiable.

Plaintiffs argue in that count that the Human Embryo Research Panel is not "fairly balanced in terms of the points of view represented and the functions to be performed," as required by Federal Advisory Committee Act (FACA), 5 U.S.C., App. 2, Section 5(b)(2). In particular, they contend that the Panel is biased in favor of proponents of human fetal research. The Government's most telling reply is that, in view of the lack of judicially manageable standards to review the "fair balance" requirement, the matter is non-justiciable and for that reason the claim must be dismissed.

■ In its broadest sense, "justiciability" refers to all the circumstances appropriate for resolution of issues by courts. The Su-

preme Court in *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) provided this definition:

> Embodied in the words "cases" and "controversies" are two complementary but somewhat different limitations. In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government. *Justiciability* is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine. (Emphasis supplied)

392 U.S. at 94–95, 88 S.Ct. at 1949–50.

Standing, which considers at whose behest adjudications may be made, is simply an aspect of the broader concept of justiciability. But justiciability also comprehends such questions as: When may courts decide issues? At what stages of a dispute? As to what issues? *See generally* Gunther, *Constitutional Law* (12th ed. 1991), p. 1590 et seq.

Defendants' claim of non-justiciability as to Count I in the present case concerns the last of these questions, *i.e.* what issues will a court decide? And what Defendants argue is that federal courts have specifically determined that they will not decide cases where, as here, the allegation is that a governmental advisory committee under the Federal Advisory Committee Act is not "fairly balanced" in its composition.

Defendants are correct. The balance of judicial opinion holds that, by reason of the lack of judicial standards to address alleged "imbalances" of membership on such committees, Courts will not decide the issue; it is non-justiciable. *See e.g. Metcalf v. Nat'l Petroleum Council,* 553 F.2d 176 (D.C.Cir. 1977); *Public Citizen, et al. v. Nat'l Advisory Committee on Microbiological Criteria for Foods, et al.,* 886 F.2d 419, 425 (D.C.Cir. 1989) (Silberman, J. concurring); *Public Citizen v. Dept. of Health and Human Services,* 795 F.Supp. 1212 (D.C.D.C.1992). *But see*

*Nat'l Anti–Hunger Coalition et al. v. Executive Committee of the President's Private Sector Survey on Cost Control,* 557 F.Supp. 524 (D.C.D.C.1983), *aff'd* 711 F.2d 1071 (D.C.Cir.1983). *Public Citizen v. Dept. of Health and Human Services* presents the basic rationale:

> Section 10(a)(2) of the APA [Administrative Procedure Act] bars judicial review of agency action when the action is "committed to agency discretion by law." Under *Heckler v. Chaney,* 470 U.S. 821, 84 L.Ed.2d 714, 105 S.Ct. 1649 (1985), agency action is committed to agency discretion by law when Congress has provided no "meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 830 [105 S.Ct. at 1655].
>
> In the case now before the Court, there are no meaningful standards by which the Court can review whether the FDA Advisory Committee is "fairly balanced in terms of the points of view represented and the functions to be performed." The Committee's purpose is to examine "the mission, responsibilities and structure of the FDA according to its legislative mandate and to make recommendations on how the Agency can be strengthened to fulfill its mission." Charter of the FDA Advisory Committee. This is a broad purpose for which there is no doubt a broad range of viewpoints. For the Court to become entangled in determining which viewpoints must be represented is for the Court to arbitrarily substitute its judgment for that of the agency. No meaningful standards are available to assist the Court in making such political and ideological determinations.

795 F.Supp. at 1220–21.

Judge Silberman elaborated these concerns in *Microbiological Criteria:*

> The relevant points of view on issues to be considered by an advisory committee are virtually infinite and, therefore, the judgment as to what constitutes an appropriate or "fair" balance of those views must be a political one. This kind of a decision is very similar to the one a chairman of a congressional committee must make when

he or she determines which witnesses should be called to testify about proposed legislation. Thus, even before the points of view on an advisory committee can be balanced at all—"fairly" or otherwise—it must first be determined which points of view should be balanced. And I can conceive of no principled basis for a federal court to determine which among the myriad points of view deserve representation on particular advisory committees.

886 F.2d at 426.

The Court agrees with Judge Hogan's opinion in the *Public Citizen* and Judge Silberman's in *Microbiological Criteria*. The mission of Human Embryo Research Panel's mission in this case is extremely broad—to consider all possible areas of research involving the extracorporeal human embryo and to provide advice as to each. The Court sees "no principled basis" upon which it could determine which among myriad points of view deserve representation on the Panel. Meaningful standards to make such "political and ideological determinations" are altogether lacking. The concerns of this suit properly belong before the executive and legislative branches of government, not the judicial.

A separate Order will be entered implementing the Court's decision.

*ORDER*

Upon consideration of Plaintiffs' Motion for Appointment of a *Guardian Ad Litem* for would-be Plaintiff Mary Doe and Defendants' Opposition thereto; and upon consideration of Plaintiffs' Motion for Preliminary Injunction and Defendants' Opposition thereto; and upon consideration of Defendants' Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment and Plaintiffs' Opposition thereto; it is for the reasons set forth in the Court's Opinion of even date, this 26th day of September, 1994

ORDERED that Plaintiffs' Motion for Appointment of a *Guardian Ad Litem* is hereby DENIED; and it is further

ORDERED that Plaintiffs' Motion for Preliminary Injunction is hereby DENIED; and it is further

ORDERED that Defendants' Motion for Summary Judgment is hereby GRANTED and Plaintiffs' Complaint and Amended Complaint are hereby DISMISSED.